Rives, Gewin and Griffin B. Bell, Circuit Judges, dissented in part.

The **UNITED STATES** of America, the Honorable Nicholas deB. Katzenbach, Acting Attorney General of the United States, and the Honorable Robert E. Hauberg, United States Attorney for the Southern District of Mississippi, Petitioners,

v.

Honorable W. Harold **COX**, United States District Judge of the United States District Court for the Southern District of Mississippi, Respondent.

The Honorable Robert E. **HAUBERG**, United States Attorney for the Southern District of Mississippi, and the Honorable Nicholas deB. Katzenbach, Acting Attorney General of the United States, Appellants,

v.

Honorable W. Harold **COX**, United States District Judge of the United States District Court for the Southern District of Mississippi, Appellee.

Nos. 22018, 22019.

United States Court of Appeals
Fifth Circuit.

Jan. 26, 1965.

Certiorari Denied June 1, 1965.

See 85 S.Ct. 1767.

John W. Douglas, Asst. Atty. Gen., David L. Rose, Morton Hollander, Dept. of Justice, Washington, D. C., for appellants.

Earl T. Thomas, L. Arnold Pyle, Joe T. Patterson, Atty. Gen., Jackson, Miss., for appellee.

Before TUTTLE, Chief Judge, and RIVES, JONES, BROWN, WISDOM, GEWIN and BELL, Circuit Judges.

JONES, Circuit Judge:

On October 22, 1964, an order of the United States District Court for the Southern District of Mississippi, signed by Harold Cox, a judge of that Court, was entered. The order, with caption and formal closing omitted, is as follows:

"THE GRAND JURY, duly elected, impaneled and organized, for the Southern District of Mississippi, reconvened on order of the Court at 9:00 A.M., October 21, 1964, in Court Room Number 2 in Jackson, Mississippi, for the general dispatch of its business. The grand jury was fully instructed as to their duties, powers and responsibilities and retired to the grand jury room number 538 in the Federal Building at Jackson to do its work. The United States Attorney (and one of his assistants) sat with the grand jury throughout the day on October 21 and explained in detail to the grand jury the perjury laws and the Court's construction of such laws for their information. The grand jury heard witnesses throughout the day on October 21, 1964. On the morning of October 22, 1964, the grand jury, through its foreman, made known to the Court in open court that they had requested Robert E. Hauberg, United States Attorney, to prepare certain indictments which they desired to bring against some of the persons under consideration and about which they had heard testimony, and the United States Attorney refused to draft or sign any such indictments on instructions of the Acting Attorney General of the United States; whereupon the Court ordered and directed said United States Attorney to draft such true bills or no bills as the grand jury may have duly voted and desired to report and to sign such instruments as required by law under penalty of contempt. The United States Attorney was afforded one hour within which to decide as to whether or not he would abide by the instructions and order of the Court in such respect. At the end of such time, the Court re-convened and the United States Attorney was specifically asked in open court as to whether or not he intended to conform with the order and direction of the Court in said respects whereupon the United States Attorney answered that he respectfully declined to do so on instructions from Nicholas deB. Katzenbach, Acting Attorney General. He was there-

upon duly adjudged by the Court to be in civil contempt of the Court and was afforded an opportunity to make any statement which he desired to make to the Court before sentence; whereupon the United States Attorney reiterated his inability to comply with the order of the Court upon express and direct instructions from Nicholas deB. Katzenbach, Acting Attorney General of the United States.

"WHEREFORE, IT IS ORDERED AND ADJUDGED by the Court that Robert E. Hauberg, United States Attorney, is guilty of civil contempt of this Court and in the presence of the Court for his said refusal to obey its said order and he is ordered into custody of the United States Marshal to be confined by him in the Hinds County, Mississippi, jail, there to remain until he purges himself of this contempt by agreeing to conform to said order by performing his official duty for the grand jury as requested in the several (about five) pending cases before them on October 21 and October 22, 1964.

"IT IS FURTHER ORDERED by the Court that a citation issue to Nicholas deB. Katzenbach, Acting Attorney General of the United States, directing him to appear before this Court and show cause why he should not be adjudged guilty of contempt of this Court for his instructions and directions to the United States Attorney to disregard and disobey the orders of this Court in the respects stated.

"The United States Attorney requested a stay of enforcement of this order and further proceedings herein for five days after this date to enable him to apply to the United States Court of Appeals for the Fifth Circuit for a writ of prohibition and such request is granted; and

these proceedings and enforcement of this order in its entirety is stayed for five days, subject to the further orders of the United States Court of Appeals on said application; and for the enforcement of all of which, let proper process issue."

The United States Attorney, Robert E. Hauberg, and the Acting Attorney General, Nicholas deB. Katzenbach, have appealed from the order and they, joined by the United States, seek a writ of prohibition against the District Judge from enforcing the Court's order, and from asserting jurisdiction to require the Attorney General or the United States Attorney "to institute criminal prosecutions or to take any steps in regard thereto." The facts recited in the order are uncontroverted. No further facts are essential to a decision of the issues before this Court. Although the issues here presented arose, in part at least, as an incident of a civil rights matter, no civil rights questions are involved in the rather broad inquiry which we are called upon to make.

The constitutional requirement [1] of an indictment or presentment [2] as a predicate to a prosecution for capital or infamous crimes has for its primary purpose the protection of the individual from jeopardy except on a finding of probable cause by a group of his fellow citizens, and is designed to afford a safeguard against oppressive actions of the prosecutor or a court. The constitutional provision is not to be read as conferring on or preserving to the grand jury, as such, any rights or prerogatives. The constitutional provision is, as has been said, for the benefit of the accused. The constitutional provision is not to be read as precluding, as essential to the validity of an indictment, the inclusion of requisites which did not exist at common law.

Traditionally, the Attorney for the United States had the power to enter a nolle prosequi of a criminal charge at any time after indictment and before

---

1. U.S.Const.Amend. V.

2. Nothing in this case involves or requires a discussion of a presentment.

trial, and this he could have done without the approval of the court or the consent of the accused. It may be doubted whether, before the adoption of the Federal Rules of Criminal Procedure, he had any authority to prevent the return of an indictment by a grand jury. There would be no constitutional barrier to a requirement that the signature of a United States Attorney upon an indictment is essential to its validity.

 It is now provided by the Federal Rules of Criminal Procedure that the Attorney General or the United States Attorney may by leave of court file a dismissal of an indictment. Rule 48(a) Fed.Rules Crim.Proc. 18 U.S.C.A. In the absence of the Rule, leave of court would not have been required. The purpose of the Rule is to prevent harassment of a defendant by charging, dismissing and re-charging without placing a defendant in jeopardy. Woodring v. United States, 8th Cir. 1963, 311 F.2d 417. Rule 7 eliminates the necessity for the inclusion in an indictment of many of the technical and prolix averments which were required at common law, by providing that the indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. The Rule also provides that "It shall be signed by the attorney for the government." Rule 7(c) Fed.Rules Crim.Proc. 18 U.S.C.A.

 The judicial power of the United States is vested in the federal courts,[3] and extends to prosecutions for violations of the criminal laws of the United States. The executive power is vested in the President of the United States,[4] who is required to take care that the laws be faithfully executed.[5] The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceedings and in the prosecution of offenses, be faithfully executed.[6] The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause.[7] Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.[8] The provision of Rule 7, requiring the signing of the indictment by the attorney for the Government, is a recognition of the power of Government counsel to permit or not to permit the bringing of an indictment. If the attorney refuses to sign, as he has the discretionary power of doing, we conclude that there is no valid indictment. It is not to be supposed that the signature of counsel is merely an attestation of the act of the grand jury. The signature of the fore-

---

3. U.S.Const. Art. III.

4. U.S.Const. Art. II, Sec. 1.

5. U.S.Const. Art. II, Sec. 3.

6. Ponzi v. Fessenden, 258 U.S. 254, 262, 42 S.Ct. 309, 66 L.Ed. 607.

7. Schwartz, Federal Criminal Jurisdiction, 13 Law & Contemp.Prob. 64; 2 Ops. Att'y Gen. 482; 38 Ops.Att'y Gen. 98.

8. Statements of the controlling principles and references to other precedents may be found in Dear Wing Jung v. United States, 9th Cir. 1963, 312 F.2d 73; Swepston v. United States, 8th Cir. 1961, 289 F.2d 166, cert. den. 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612; People v. Florio, 301 N.Y. 46, 48, 92 N.E.2d 881, 17 A.L.R.2d 993; Hassan v. Magistrates Court, 20 Misc.2d 509, 191 N.Y.S.2d 238; Murphy v. Sumners, 54 Tex.Cr.R. 369, 112 S.W. 1070.

man performs that function. It is not to be supposed that the signature of counsel is a certificate that the indictment is in proper form to charge an offense. The sufficiency of the indictment may be tested before the court. Rather, we think, the requirement of the signature is for the purpose of evidencing the joinder of the attorney for the United States with the grand jury in instituting a criminal proceeding in the Court. Without the signature there can be no criminal proceeding brought upon an indictment. Substantial compliance rather than technical exactness meets the requirement of the rule. There seems to be no authority for the statement that the absence of a signature is not fatal. 4 Barron & Holtzoff Federal Practice & Procedure 61, § 1913.

If it were not for the discretionary power given to the United States Attorney to prevent an indictment by withholding his signature, there might be doubt as to the constitutionality of the requirement of Rule 48 for leave of court for a dismissal of a pending prosecution.[9]

 Because, as we conclude, the signature of the Government attorney is necessary to the validity of the indictment and the affixing or withholding of the signature is a matter of executive discretion which cannot be coerced or reviewed by the courts, the contempt order must be reversed. It seems that, since the United States Attorney cannot be required to give validity to an indictment by affixing his signature, he should not be required to indulge in an exercise of futility by the preparation of the form of an indictment which he is unwilling to vitalize with his signature. Therefore he should not be required to prepare indictments which he is unwilling and under no duty to sign.

Judges Tuttle, Jones, Brown and Wisdom join in the conclusion that the signature of the United States Attorney is essential to the validity of an indictment. Judge Brown, as appears in his separate opinion, is of the view that the United States Attorney is required, upon the request of the grand jury, to draft forms of indictments in accordance with its desires. The order before us for review is in the conjunctive; it requires the United States Attorney to prepare and sign. A majority of the court, having decided that the direction to sign is erroneous, the order on appeal will be reversed.

 So much of the order of the district court as adjudges the United States Attorney for the Southern District of Mississippi to be in contempt is a final order, appealable as such, and for the reasons here assigned, is reversed. That part of the order of the district court as would require the Acting Attorney General to show cause why he should not be held in contempt is interlocutory and not appealable, and the appeal of the Acting Attorney General will be dismissed.

 There remains for our consideration and disposition the petition of the United States, the Acting Attorney General and the United States, for a Writ of Prohibition to prohibit the Respondent District Judge from enforcing the order. The reversal of the order as to the United States Attorney makes unnecessary, so far as he is concerned, any consideration of the application for a Writ of Prohibition. There has been no citation issued for service on the Attorney General requiring him to show cause. He has not yet been put in jeopardy. Our disposition of the appeal makes it improbable that such citation will be issued and served. It does not appear that there is any necessity at this time for the issuance of the discretionary Writ of Prohibition. The petition will be denied.

 We are of the opinion that whenever a United States Attorney is under a legal duty which he has been directed to perform by a valid order of court, his refusal to perform such duty and comply with such order will not be justified or

---

9. Consideration of the constitutionality of the rule is not necessary for the disposition of the matters before us.

excused by instructions from the Attorney General to disregard his duty and disobey the order. Thus the way is open for relief if a further order is entered with respect to the rendering of assistance to the grand jury by the United States Attorney in the preparation of indictments.

The respondent-appellee has challenged the right of the United States to join in the petition for a Writ of Prohibition. We find it unnecessary to pass on this question.

The Court's mandate will issue forthwith. Appeal dismissed as to Katzenbach, Acting Attorney General. Order on appeal reversed as to Hauberg, United States Attorney. Petition for writ of prohibition denied.

RIVES, GEWIN and GRIFFIN B. BELL, Circuit Judges (concurring in part and dissenting in part):

The question presented arose pointedly when the foreman of the grand jury, in the presence of the grand jurors in open court, requested help from the court as follows:

"BY FOREMAN COWAN:

"Judge Cox, we have under consideration three different matters, *two we have concluded,* the third is in the process of being concluded. On yesterday we asked Mr. Hauberg, the United States District Attorney, to. assist us in preparing true bills in the manner that we have been served here before handing us these bills. Mr. Hauberg said that he could not do so without permission being given from the Department in Washington. We concluded yesterday afternoon by asking him to secure that permission and *to have those true bills ready for us this morning.* Mr. Hauberg now tells us that he has been instructed on all three matters not so to do. In other words we are at the position now in the event that we should vote indictment why we don't know what to do with it after that may or may not be accomplished." (Emphasis added.)

The court then asked the District Attorney if he wished to respond. The District Attorney stated that he had been instructed by the Acting Attorney General not to prepare the indictments. The record discloses that the grand jury had heard evidence about certain matters which the Attorney General's office had already investigated and determined did not warrant prosecution. The grand jury had also heard evidence about matters of which the Attorney General had no knowledge and had made no investigation.[1] The District Attorney disclosed to the court that the Acting Attorney General had directed him to request the

1. "BY MR. HAUBERG:

"If the Court please, after the grand jury requested me to prepare proposed indictments in several matters on yesterday I contacted Mr. Burke Marshall and had a lengthy conversation with him and was to receive further instructions early this morning, but last night I was instructed that not to prepare the proposed indictments. This morning on the telephone with Mr. Katzenbach, the Acting Attorney General of the United States, and Mr. Burke Marshall both on the telephone there I was directed by Mr. Katzenbach that as to the one of the matters the Department of Justice and the United States felt as if the law and the fact was not sufficient to constitute perjury and that an indictment thereon would be no good.

"BY THE COURT:

"That's in connection with the two witnesses for the government wasn't it that they are considering?

"BY MR. HAUBERG:

"Yes, Your Honor, and as to the other two matters the Department of Justice had no knowledge of the individuals involved until the Grand Jury received or started taking testimony on its starting out with Mr. Boyce Holleman back I believe on the 30th of September and the Department had not conducted or had the FBI conduct any investigation in either that matter or in the matter which subsequently came to the attention of the Grand Jury this week. I am authorized to state that the Attorney General has requested me and directed me to ask the FBI to investigate those other

FBI to investigate such matters, but that he had likewise been directed not to proceed in assisting the grand jury. In this colloquy the court stated to the District Attorney that the court considered the grand jury to be within its province in hearing the matters under consideration and in passing upon them pursuant to their oath. Accordingly, the court directed the District Attorney to disregard his instructions from the Department of Justice and to serve the grand jury by preparing the true bills as had been requested. The court then recessed and requested the District Attorney to communicate further with the Department of Justice and to advise that Department of the instructions of the court. After the recess, the District Attorney reported to the court that he had conferred by telephone with the Acting Attorney General who instructed him as follows:

"I have been instructed 'As United States Attorney neither you nor any of your assistants are authorized to prepare or to sign indictments in the matters being heard on October 21 and 22 by the Grand Jury and I direct you and your assistants to refrain from doing so in your official capacity. If the Court should direct you to disregard my instructions on pain of contempt you should inform the Court that the Department will immediately apply to the Court of Appeals for a writ prohibiting such an order. You should request the Court for a stay of fur-

ther proceedings pending the application and decision with respect to the writ of prohibition."

The court further inquired whether the District Attorney was refusing to obey the court's order to prepare true bills and sign the same as requested by the grand jury "in these cases presently pending and being considered by the Grand Jury." The District Attorney stated to the court as follows:

"If the Court please, because of instructions I have received I most humbly and respectfully have to refuse to comply."

Thus the basic issue before this Court is whether the controlling discretion as to the institution of a felony prosecution rests with the Attorney General [2] or with the grand jury. The majority opinion would ignore the broad inquisitorial powers of the grand jury, and limit the constitutional requirement of Amendment V to the benefit of the accused.[3]

We agree with Professor Orfield that:

"The grand jury serves two great functions.[360] One is to bring to trial

"360. In re Charge to Grand Jury, C.C.C. Cal.1872, 30 Fed.Cas. pages 992, 993, No. 18,255, dissenting opinion of Harlan, J., in Hurtado v. People of State of California, 1884, 110 U.S. 516, 538, 555–556, 4 S.Ct. 111, 28 L.Ed. 232; Ex parte Bain, 1887, 121 U.S. 1, 11, 7 S.Ct. 781, 786, 30 L.Ed. 849.

persons accused of crime upon just grounds. The other is to protect persons against unfounded or mali-

two matters, but that as United States Attorney I would be unable to proceed in either one of these matters, so I have now as of this morning, Your Honor, been directed by Mr. Katzenbach that as a United States Attorney or representing the United States of America that I cannot proceed in any one of these three matters, that Mr. Katzenbach, the Attorney General, has taken away my authority as such."

2. The United States Attorney has acted at the direction of the Attorney General,

and the record does not disclose his independent views.

3. According to the majority, "The constitutional provision is not to be read as conferring on or preserving to the grand jury, as such, any rights or prerogatives. The constitutional provision is, as has been said, for the benefit of the accused. The constitutional provision is not to be read as precluding, as essential to the validity of an indictment the inclusion of requisites which did not exist at common law."

cious prosecutions by insuring that no criminal proceeding will be undertaken without a disinterested determination of probable guilt. The inquisitorial function has been called the more important.[361]

"[361]. In re Grand Jury Proceedings, D. C.E.D.Pa.1933, 4 F.Supp. 283, 284." Orfield, The Federal Grand Jury, 22 F. R.D. 343, 394.

In the case last cited by Professor Orfield, Judge Kilpatrick said:

"The inquisitorial power of the grand jury is the most valuable function which it possesses today and, far more than any supposed protection which it gives to the accused, justifies its survival as an institution. As an engine of discovery against organized and far-reaching crime, it has no counterpart. Policy emphatically forbids that there should be any curtailment of it except in the clearest cases."

In re Grand Jury Proceedings, D.C.E.D. Pa.1933, 4 F.Supp. 283, 284.

The grand jury possesses plenary and independent inquisitorial powers. The Supreme Court has held that an Executive Order and a Circular Letter of the Department of Justice requiring approval of the Attorney General before any evidence could be presented in certain cases "was not intended to curtail or limit the well-recognized power of the grand jury to consider and investigate any alleged crime within its jurisdiction. See United States v. Thompson, 251 U.S. 407, 413–415, 40 S.Ct. 289, 291–292, 64 L.Ed. 333; Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 779; Hale v. Henkel, 201 U.S. 43, 61–66, 26 S.Ct. 370, 373–376, 50 L.Ed. 652; Frisbie v. United States, 157 U.S. 160, 163, 15

4. Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370; United States v. Thompson, 1920, 251 U.S. 407, 40 S.Ct. 289; Blair v. United States, 1919, 250 U.S. 273, 39 S.Ct. 468; Frisbie v. United States, 1895, 157 U.S. 160, 15 S.Ct. 586; United

S.Ct. 586, 587, 39 L.Ed. 657." Sullivan v. United States, 1954, 348 U.S. 170, 173, 75 S.Ct. 182, 184, 99 L.Ed. 210.

A federal grand jury has the unquestioned right to inquire into any matter within the jurisdiction involving violations of law and to return an indictment if it finds a reasonable probability that a crime has been committed. This it may do at the instance of the court, the District Attorney, the Attorney General or on its own initiative, from evidence it may gather or from knowledge of its members.[4]

The majority holds that: "The provision of Rule 7, requiring the signing of the indictment by the attorney for the Government, is a recognition of the power of Government counsel to permit or not to permit the bringing of an indictment."

With deference we call attention that no authority is cited in support of that holding and we submit that it ignores the history of the grand jury and of the Rules of Criminal Procedure. Professor Orfield, himself a member of the Advisory Committee on Rules of Criminal Procedure, has preserved for us the history of Rule 6, captioned "The Grand Jury." See 22 F.R.D. 346–357. There is nothing in that history, nor in the succeeding Rule 7, which would authorize Government counsel to so radically reduce the powers of the grand jury. To the contrary, Professor Orfield points out that before the federal criminal rules, "It was the practice of the United States Attorney or his assistant to sign the indictment and for the foreman to sign below the endorsement 'A True Bill' on the face of it." 22 F.R.D. 377, 378. Rule 7 simply continued the already existing practice. Professor Orfield further states,

States v. Philadelphia & R. Ry. Co., E.D. Pa.1915, 225 F. 301; United States v. Smythe, N.D.Cal.1952, 104 F.Supp. 283; Re Miller (D.C.Pa.) F.Cas. No. 9552; and see Re Charge to Grand Jury (C.C. W.Va.) F.Cas. No. 18248.

"When the United States Attorney does sign, this 'merely attests the action of the grand jury.' [357]

"[357]. Crowley v. United States, 1904, 194 U.S. 461, 475, 24 S.Ct. 731, 737, 48 L.Ed. 1075."

22 F.R.D. at 394. In the case cited by Professor Orfield, Crowley v. United States, 1903, 194 U.S. 461, 475, 24 S.Ct. 731, 737, the Supreme Court said:

"The *indictment* embodies charges made by grand jurors, and *the signature of the United States Attorney merely attests the action of the grand jury*, whereas an *information* rests upon the responsibility of the attorney representing the government, and imports an investigation of the facts by him in his official capacity." (Emphasis added.)

The finding and return of the indictment are the acts of the grand jury. When a United States Attorney prepares and signs an indictment, he does not adopt, approve, or vouch for the charge, nor does *he* institute a criminal prosecution.[5]

The United States Attorney cannot, except in an advisory capacity, inquire into the merits of whether indictments should be found and returned in particular cases being considered by the grand jury. Only the grand jurors themselves have that power. It would be grossly wrong for it to be usurped. Moreover, that is practically impossible, because "no person other than the [grand] jurors may be present while the grand jury is deliberating or voting." Rule 6(d), F.R.Crim.P. The responsibility of finding and returning an indictment rests solely upon the grand jurors.

5. That is true also as to the foreman who is under a duty to "sign *all* indictments," including those for which he does not vote. See Rule 6(c). (Emphasis added.)

6. In re Lane, 1890, 135 U.S. 443, 449, 10 S.Ct. 760; Abramson v. United States, 5 Cir. 1964, 326 F.2d 565, 567; United States v. Keig, 7 Cir. 1964, 334 F.2d 823; Wiltsey v. United States, 4 Cir. 1955,

The majority holds, "If the attorney [that is the attorney for the Government] refuses to sign, as he has the discretionary power of doing, we conclude there is no valid indictment." The only authority cited for that holding is 4 Barron & Holtzoff, Federal Practice & Procedure 61, § 1913, which, in turn, cites Wheatley v. United States, 4 Cir. 1946, 159 F.2d 599, where the rule was well stated as follows by Judge Soper, Judges Parker and Dobie concurring:

"It has been held that the signature of the prosecuting attorney is no part of the indictment and is necessary only as evidence of the authenticity of the document; and it has also been held that the improper signing of an indictment is not such a defect as would invalidate the instrument; In re Lane, 135 U.S. 443, 449, 10 S.Ct. 760, 34 L.Ed. 219; Miller v. United States, 6 Cir., 300 F. 529, 536, certiorari denied, 266 U.S. 624, 45 S.Ct. 123, 69 L.Ed. 474; King v. United States, 5 Cir., 279 F. 103, 104; United States v. McAvoy, C.C.N.Y., 26 Fed.Cas. (No. 15,654) 1044, 1045."

We submit that the rule is well settled that the absence of the signature of the United States Attorney from an indictment does not invalidate a conviction based on it.[6]

Rule 7(c), F.R.Crim.P., provides that the indictment "shall be signed by the attorney for the government." [7] Rule 6 (c) requires that the foreman of the grand jury also "shall sign all indictments." [8] An indictment may be found upon the concurrence of twelve or more jurors. It must be returned by the grand jury to a judge in open court. Such return is not adequate authentication.

222 F.2d 600; Wheatley v. United States, 4 Cir. 1946, 159 F.2d 599; King v. United States, 5 Cir. 1922, 279 F. 103.

7. "Attorney for the government" is defined in Rule 54(c), F.R.Crim.P.

8. The forms attached to Rule 58 provide for the signatures of both the foreman and the United States Attorney.

Rule 6(f). Professor Orfield states that, "Indorsement is desirable as sometimes grand juries return indictments which they have not found." Orfield, "The Federal Grand Jury," 22 F.R.D. 343, 377. The signature of the United States Attorney is a mere authentication that the indictment is the act of the grand jury.

It is not for us to pass upon the wisdom of requiring such authentication. It is enough that the law provides for the indictment to be authenticated by the signature of the attorney for the government. The United States Attorney is an officer of the court, and may be required to perform this purely ministerial act. There are few legal documents which bear more awful import and potential effect upon liberty and life than does an indictment. The importance of an indictment makes rational the triple authentication which the rules have seen fit to require; viz., that it be signed both by the attorney for the government and by the foreman, and that it be returned by the grand jury to a judge in open court. All doubt will thus be removed as to whether the indictment is really the act of the grand jury.

The Attorney General himself takes the position that the grand jury has the power to return a valid indictment without the signature of the District Attorney, but contends that such an indictment does not require the defendant charged therein to answer or plead to it, or to appear and give bond. Such an indictment, according to the Attorney General's contentions, is innocuous so far as the defendant is concerned, unless and until the District Attorney or one of his assistants signs. In the meantime it is conceded that such an indictment would lie in court inactive and ineffective. Statutes of limitations would not be tolled by the return of such an indictment according to the Attorney General. He asserts that only the signature of the District Attorney (or his authorized assistants) gives the indictment life. Such argument is used to support the position that the action of the Department of Justice or the District Attorney in refusing to prepare or sign the indictment in no way impairs, impedes or influences the action of the grand jury. The Attorney General suggests that the grand jury can obtain assistance to a degree from the judge, and that some "outside person" may assist the grand jury in preparing the indictment, but that such "outside person" has no authority to sign the indictment and no authority to enter the grand jury room. In our view, the position of the Attorney General is untenable. We subscribe fully to the following assertion from the exhaustive and scholarly opinion of Judge Fee in United States v. Smyth, subsequently cited with approval by the Supreme Court in Sullivan v. United States, supra.

"The grand jury is similar to the trial jury, who may convict notwithstanding positive instructions to acquit and who may pardon notwithstanding a direction to find guilty. Unquestionably, the grand jury are under no necessity to follow the orders of the prosecutor. They can present an indictment whether he will or no." [9] (104 F.Supp. 283, 294.)

The Attorney General insists that the prosecution of offenses against the United States is an executive function of the

9. In support of the quoted conclusion, Judge Fee quotes the following in footnote 44 from the Manual for Grand Jurors, prepared by the Federal Grand Jurors Association for the Eastern District of New York, Congressional Record, February 21, 1952, A1115:

"'8. What is the place of the United States Attorney (or his assistant) in the functioning of the grand jury? You must naturally accord him the respect due an officer of the government, sworn to protect and enforce its laws; you must realize that usually he is an intelligent, experienced individual acting in all sincerity. But do not forget that he is from the viewpoint of the grand jury, only a lawyer, an agent of the Federal Department of Justice and by law he is only the legal advisor to the grand jury. This does not make him infallible in his opinions, although his experience and position require respectful attention of the ju-

Attorney General deraigned from the executive power vested in the President to "take care that the laws be faithfully executed." U.S.Const. art. II, § 3. The short answer is that one of the most fundamental and important of the laws so to be faithfully executed is the clear and explicit provision of the Fifth Amendment to the Constitution that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *."

The Fifth Amendment adopted the grand jury as it had then been developed in England over the course of many centuries, and made it a part of the fundamental law of the United States for the institution of prosecutions for crime.[10] Thus the grand jury originated long before the doctrine of separation of powers was made the constitutional basis of our frame of government. The same Constitution which separated the three powers of government adopted the institution of the grand jury. It follows that no nice distinction need be drawn as to whether the grand jury may perform some function of the executive depart-

ment. As well said by the Seventh Circuit:

"While the grand jury is, in a sense, a part of our court system, when exercising its traditional functions it possesses an independence which is unique. Its authority is derived from none of the three basic divisions of our government, but rather directly from the people themselves."

In re April 1956 Term Grand Jury, 1956, 239 F.2d 263, 269.

Moreover, in point of law and reality, the plenary inquisitorial power of the grand jury does not impinge in the slightest upon the executive function of the Attorney General to prosecute or not to prosecute offenses against the United States, for as soon as the indictment is returned, "The Attorney General or the United States Attorney may by leave of court file a dismissal * * *." Rule 48 (a), F.R.Crim.P. The majority express the view that their holding of a discretionary power of the United States Attorney to prevent an indictment is needed to remove some doubt as to the constitutionality of the requirement of Rule 48

rors. Should a dispute arise between him and the grand jury, recourse should be had to the federal judge who administered the oath to you.' The grand jury has the power and duty: '7. To insist at all times on the independence of the grand jury from pressures of any sort, whether these stem from the prosecuting official or the court * * *.'"

Judge Fee makes the following additional assertions in his opinion as to the power of grand jurors:

"* * *. As such, with its essential elements of plenary power to investigate and secrecy of its deliberations, it was preserved by the Constitution of the United States not only to protect the defendant but to permit public spirited citizens, chosen by democratic procedures, to attack corrupt conditions. A criticism of the action of the grand jury is a criticism of democracy itself." (Opinion p. 288.)

"* * *. But the grand jurors, by use of secrecy of their proceedings, stubbornly retained the power of insti-

tuting an investigation of their own knowledge or taking a rumor or suspicion and expanding it through witnesses. As we shall see, this comprehensive power also remains at this hour. The Constitution of the United States preserved the grand jury with all its powers and inherent character. * * * No other instrument can cope with organized crime which cuts across state lines, conspiracies to overthrow the government of the United States, or alleged deviations from rectitude by those who have been entrusted by the government with public trust. Even the most virulent critics are unanimously in accord that the grand juries must be preserved in the federal system for these purposes." (Opinion pp. 290–291.)

10. See Costello v. United States, 1956, 350 U.S. 359, at 361, 76 S.Ct. 406, 100 L.Ed. 397; Ex parte Bain, 1887, 121 U.S. 1, 10, 11, 7 S.Ct. 781, 30 L.Ed. 849; In re April 1956 Term Grand Jury, 7 Cir. 1956, 239 F.2d 263, 268, 269.

for leave of court for a dismissal of a pending prosecution. We do not agree that any such doubt exists. Rule 48(a) was primarily intended to authorize the court to protect defendants and not to confer prosecutive functions upon the court. Judge Weinfield in United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n, S.D.N.Y.1964, 228 F.Supp. 483, 489–490, well described the situation which might arise after indictment where the Attorney General or the United States Attorney does not wish to prosecute and where the district court denies dismissal:

> "The Attorney General is the head of the Department of Justice, a part of the Executive branch of the Government. Even were leave of Court to the dismissal of the indictment denied, the Attorney General would still have the right to adhere to the Department's view that the indictment cannot be supported by proof upon a trial of the merits, and accordingly, in the exercise of his discretion, decline to move the case for trial. The Court in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine. And if the indictment continues to remain in status quo, each defendant would be in a position to move for dismissal of the indictment under Rule 48(b)."

The grand jury may be permitted to function in its traditional sphere, while at the same time enforcing the separation of powers doctrine as between the executive and judicial branches of the government. This can best be done, indeed, it is mandatory, by requiring the United States Attorney to assist the grand jury in preparing indictments which they wish to consider or return, and by requiring the United States Attorney to sign any indictment that is to be returned. Then, once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward. That refusal will, of course, be in open court and not in the secret confines of the grand jury room. To permit the district court to compel the United States Attorney to proceed beyond this point would invest prosecutorial power in the judiciary, power which under the Constitution is reserved to the executive branch of the government. It may be that the court, in the interest of justice, may require a showing of good faith, and a statement of some rational basis for dismissal. In the unlikely event of bad faith or irrational action, not here present, it may be that the court could appoint counsel to prosecute the case. In brief, the court may have the same inherent power to administer justice to the government as it does to the defendant. That question is not now before us and may never arise. Except for a very limited discretion, however, the court's power to withhold leave to dismiss an indictment is solely for the protection of the defendant.

The United States Attorney is under an affirmative and mandatory duty to lend his assistance to a grand jury in making effective its decision to institute a criminal prosecution. When the grand jury insists on finding and returning an indictment, the Attorney General must acquiesce, even though its action may be contrary to the advice of the United States Attorney. The further prosecution of the case is another matter.

We agree that proper enforcement of the law does not require that indictments should be returned in every case where probable cause exists. Public policy may in some instances require that a case not be prosecuted. Such consideration of public policy may be submitted to and acted on by the grand jury. As well said by Colonel E. R. Mattoon in an article entitled "The Lawyer as a Social Force," 15 Ala.Law, 55, 64 (1954): "* * * the jury system calls on the lawyer to have faith in the common man—that the average citizen can be relied on, when given an adequate explanation, to understand a problem, apply reason to it, and arrive at a wise solution. This faith in

the common man to solve his problems by his own reason is of the essence of a democracy." In the few cases in which the United States Attorney is unable to persuade the grand jury and the Attorney General disagrees with its action, his recourse is not to prevent the grand jury from finding and returning an effective indictment, but to file a dismissal of the indictment under Rule 48(a), F.R. Crim.P.[11]

For the Attorney General to prevent the grand jury from returning an indictment would, in effect, be to confine the grand jury to returning a mere presentment. That derogates from the grand jury its alternative power to return either "a presentment or indictment." U. S.Const. amend. V. The power of the grand jury cannot be limited in any case to a presentment; it may return an indictment.

Looking beyond the present controversy, one can foresee the grave danger inherent in such a restriction of the powers of a grand jury. If a grand jury is prevented from returning an indictment no more effective than a presentment, the statute of limitations may permanently bar prosecution for the crime. When the presentment is made public, the accused may flee or witnesses may get beyond the jurisdiction of the court. For all practical purposes, the case could be dead and there would be no point in any future Attorney General causing the presentment to be followed by an indictment. Worse still, this could be accomplished in the shadows of secrecy, with the Attorney General not being required to disclose his reasons. How much better is the constitutional system by which the grand jury can find and return an effective indictment upon which a prosecution for crime is instituted. At that point the power of the grand jury ceases. It is effectively checked and overbalanced by the power of the Attorney General, recognized in Rule 48(a), to move for a dismissal of the indictment. The court may then require such a motion to be heard in open court. Instead of a prevention in the shadows of secrecy, there would be a dismissal in a formal, public judicial proceeding. ¶We do not believe that the Acting Attorney General has the authority to instruct a District Attorney to refuse to serve a grand jury when help is requested directly by the grand jury and when he is ordered by the presiding trial judge to give such service and assistance. That question arose in United States v. Smyth, supra, where there appeared to be a conflict between an assistant district attorney and his superiors. The court concluded:

". * * * So, when the grand jury is impaneled, an Assistant United States Attorney goes into the grand jury room. So far as the grand jury and the public are concerned, he is the United States Attorney. All accept him as such. He need not wear a uniform. He need not present to the grand jury authorization signed by the United States Attorney. He is an officer duly designated and acting by virtue of his appointment. He has power to be present at any session of the grand jury and may talk to them freely inside or outside the grand jury room, except when the grand jury is deliberating or voting. *His authority is not destroyed by any order of the United States Attorney that someone else conduct the proceedings or by any controversy in the office of the United States Attorney.*" (Emphasis added.) (104 F.Supp. 306.)

In brief and in oral argument the Acting Attorney General states that ethical or moral considerations support his re-

---

**11.** Under the Attorney General's theory as to separation of powers, it is logical to argue that the Attorney General or the United States Attorney has the power to prevent a bench warrant from issuing on an indictment even though it has been held that the court itself has no such power. Ex parte United States, 1932, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283. Such a result is, however, somewhat anomalous or at least startling.

fusal to permit assistance to the grand jury or to permit the signing of the indictment by a government attorney. He relies on Rule 11, F.R.Civ.P. and Rule 7(c), F.R.Crim.P.[12] We disagree. It is true that an indictment may properly be described as a type of pleading in a criminal case, but it constitutes the action of the grand jury and not the Attorney General. No one could logically contend that the Attorney General or the District Attorney was preferring the charges, because neither of them is permitted to remain in the grand jury room during deliberations or when the grand jurors vote a true bill or refuse to indict.[13] It is well for the Attorney General to investigate, but conclusions reached by him as to facts are not binding on the grand jury. Grand jurors are unlimited in their inquisitorial powers. Their source of information is not limited to facts disclosed by investigative agencies or to information furnished by the Attorney General or the District Attorney.[14] It is often true that lawyers and judges alike disagree with the actions of petit juries and grand juries. Corrective legal action may be taken, but neither the grand jury nor the petit jury can be compelled to follow the course of action desired by either the court or the Justice Department. The short answer to all of these contentions is the fact that Rule 11, F.R.Civ.P. does not apply to an indictment. On the other hand, Rule 7(c),

F.R.Crim.P. positively requires the signature of the District Attorney.

By way of precaution, let us state that nothing here said is intended to reflect upon the present Acting Attorney General, in whose integrity we have the utmost confidence. Memory goes back, however, to days when we had an Attorney General suspected of being corrupt. There is no assurance that that will never again happen. We are establishing a precedent for other cases; we are construing a Constitution; we should retain intact that great constitutional bulwark, the institution of the grand jury.

■ On the cases before the Court, we agree with Judge Brown that the United States Attorney is required, upon the request of the grand jury, to draft forms of indictment in accordance with its desires. There is thus a majority of the Court in favor of that holding. We go further, and think that the United States Attorney is required to sign any indictment that may be found by the grand jury. We concur with the majority as to the dismissal of the appeal of the Acting Attorney General and as to the denial of the petition for writ of prohibition. We would, however, affirm the judgment of civil contempt against the United States Attorney.

We therefore concur in part and dissent in part.

---

12. See Rule 7(c), F.R.Crim.P. Rule 11 provides:

"The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. * * * For a wilful violation of these rules an attorney may be subjected to appropriate disciplinary action."

13. The rule may be different as to significance of the District Attorney's signature on an information. That question is not before us.

14. The following statement of the rule was approved in United States v.

Thompson, 1920, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333:

"That the power and duty of the grand jury to investigate is original and complete, susceptible of being exercised upon its own motion and upon such knowledge as it may derive from any source which it may deem proper, and is not therefore dependent for its exertion upon the approval or disapproval of the court; that this power is continuous and is therefore not exhausted or limited by adverse action taken by a grand jury or by its failure to act, and hence may thereafter be exerted as to the same instances by the same or a subsequent grand jury."

JOHN R. BROWN, Circuit Judge (concurring specially):

■ Mine is a middle course. I agree with the opinion written by Judge Jones that the District Attorney may not be compelled to sign the formal indictment which the Grand Jury has voted to return. I concur also that F.R.Crim.P. 48 (a) vests the unfettered discretion in the District Attorney to determine whether a prosecution is to be maintained or dismissed. The trial Court's range of action is confined to the protection of the rights of the defendant, F.R.Crim.P. 48(b). But I do not agree that the District Attorney may ignore the efforts of the Grand Jury to the point of declining to prepare in proper legal form the indictment they have voted to return. On the contrary, I am of the view that the Court may properly compel the District Attorney to act as legal scrivener to the Grand Jury. The Court may, therefore, order the District Attorney to prepare the indictment in legal form. Since the joint Rives-Gewin-Bell opinion would empower the Court to compel signing of the indictment—a thing which necessarily encompasses preparation of the writing—I align myself with them to the extent of ordering the District Attorney to prepare the indictment.

Before discussing this limited duty, I have these comments in furtherance of the Court's holding that the prosecutor may not be compelled to sign the indictment—the necessary last step to an indictment's vitality.

Responsibility for determining whether a prosecution is to be commenced or maintained must be clearly fixed. The power not to initiate is indeed awesome. But it has to reside somewhere. And the more clearly pinpointed it is, the more the public interest is served through the focus of relentless publicity upon that decision. It may not, with safety, be left to a body whose great virtue is the combination of anonymity, transitory authority, and political unresponsibility.

All must be aware now that there are times when the interests of the nation require that a prosecution be foregone. These instances will most often be in the area of state secrets and national security. With stakes so high, the safety of our country, and hence the security of the world, ought not to be imperiled by leaving the important decision to a body having no definitive political responsibility. And it is hardly realistic to suggest, as do the dissenters, that these factors may be evaluated by the Grand Jury. What will be the source of their information? How extensive will it be? How close will a Grand Jury session approach a presidential cabinet meeting? How will essential government secrets be kept when disclosed to persons none of whom as Grand Jurors will have been subjected to customary security clearance checks?

And even in less sensitive areas, the practical operation of the prosecutorial function makes imperative the need for executive determination. The familiar example is the deliberate choice between those to be prosecuted and those who, often equally guilty, are named as co-conspirators but not as defendants, or others not named who are used as star government witnesses. And in other situations, of which the instant case may well be typical,[1] the executive's purpose to effectuate specific policies thought to be of major importance would be frustrated or encumbered were a Grand Jury given the sole prerogative of determining when a prosecution is to be effectively commenced.

Putting to one side these factors which bear on the delicate nature of governmental decisions, there are technical reasons indigenous to criminal law which are equally compelling. Federal crimes are more and more for violation of highly complex statutes. Federal jurisdiction, indeed, whether the activity consti-

---

1. Use of the "law" is a common weapon against members of a class seeking to achieve civil rights. Such action is now specifically prohibited by the Civil Rights Act of 1964. See, e. g., § 203(c), 42 U.S. C.A. § 2000a-2 (1964).

tutes a federal crime, depend on intricate facts, many beyond the knowledge and experience of laymen composing the Grand Jury.[2] The aim of the Grand Jury indictment as the means of protecting the citizen against the initiation of unfounded charges is hardly advanced by a rule that permits the Grand Jury on its own to initiate the prosecution when the conscientious District Attorney knows to a legal certainty that a federal crime cannot be established.

Finally, it seems to me incongruous to assert, as do the dissenters, that the signing of the indictment is a ministerial act having no function other than one of authentication. I am, of course, aware that language of such import has been employed in some of the cases.[3] I do not see why an indictment formally signed by the foreman and reported in a solemn open court proceeding as the act of the Grand Jury needs "authentication". And I am at a complete loss to understand how the District Attorney— excluded as he is from the Grand Jury while it is voting, F.R.Crim.P. 6(d)—

can "authenticate" from hearsay, or why his imprimatur is any better or different than that which would come from other Grand Jurors, each of whom can be polled by the Judge, not as to his vote, but whether a majority did vote to return the true bill.[4]

The fact is that the signature of the District Attorney has much more awesome consequence. Without a doubt that signature, together with that of the Grand Jury's foreman, is a formal, effective initiation of a prosecution. What it might be in the absence of the District Attorney's signature, we need not determine. With it, the whole prosecution has been started. And what was previously an unfettered discretionary right on the part of the executive not to initate prosecution has now been set in motion and can be stopped only on the executive taking affirmative action[5] for dismissal with all of the uncertainties which F.R. Crim.P. 48(a) generates.[6]

But while I am firm that signature is a vital and significant act which reflects the exercise of an executive discretion to

2. See, as examples, prosecution for violation of the Pure Food & Drug Act, Van Liew v. United States, 5 Cir., 1963, 321 F.2d 664, and 321 F.2d 674; and for failure to file SEC registration statements for the sale of oil leases subsequently construed to be investment contracts, Roe & Stratoray Oil, Inc. v. United States, 5 Cir., 1961, 287 F.2d 435, and 1963, 316 F.2d 617.

3. See note 6 of the Rives-Gewin-Bell opinion. Interestingly, enough, in all but one the indictment was actually signed, though signed by the Assistant District Attorney, not the District Attorney himself. In the other the signature was typed. No case has yet held that an indictment which the District Attorney deliberately refuses to sign has any vitality.

4. In the instant case signature or other action of the District Attorney was not needed to establish what the Grand Jury desired to do.

5. The humor of the incident as reported by the Supreme Court of California does not conceal this great historical truth:
 "An incident related in 2 Campbell's Lives of the Chancellors 173 is of interest in this connection. After [Lord

Holt] had ordered the imprisonment of a group of fanatics called 'Prophets' for seditious language, [he] was visited by Lacy, one of their friends, who informed a servant that he carried a message 'from the Lord God.' Lacy was admitted and told Lord Holt: 'I come to you a prophet from the Lord God, who has sent me to thee, and would have thee grant a nolle prosequi for John Atkins, his servant, whom thou has cast into prison.' Lord Holt replied: 'Thou art a false prophet, and a lying knave. If the Lord God had sent thee it would have been to the Attorney-General, for he knows that it belongeth not to the Chief Justice to grant a nolle prosequi; but I, as Chief Justice, can grant a warrant to commit thee to bear him company.' "
People v. Sidener, 1962, 58 Cal.2d 645, 25 Cal.Rptr. 697, 698, n. 4, 375 P.2d 641, 642.

6. The Court seems to be in virtual agreement that this rule is for the protection of the defendant alone. But the fact is we have not yet so held in a case directly presenting the question and in any event, viewed from the standpoint of the parties here, neither the District Attor-

initiate prosecution—a thing here lacking—I am equally positive that the District Attorney has the duty to prepare the indictment when requested to do so by the Grand Jury. If this lacks logical consistency, I can only urge that an institution as old as the Grand Jury, implanted in the structure as idealistic as the Constitution, is one born, not out of logic, but out of the needs of history's rich experience.

Whether a Grand Jury is, or is not, an agency outside of or beyond the traditional three powers, it certainly exists. It exists as a distinct institution with important functions. It operates as an established agency in connection with the Federal Judiciary. It is customarily charged with the important duty—as it was here specifically—to look into all crimes against the Federal Government.

Since it is charged with the duty of ascertaining whether, in the opinion of the Grand Jury, there is probable cause for believing that federal crimes have been committed, it has not only the right but the imperative duty to make a report of its conclusions to the tribunal giving it those instructions. As it is an instrument of the law, it is entitled to make its official report in a mode and terminology befitting that atmosphere. Broadly stated, it may report in one of three ways. It may formally report a no bill. It may return a true bill indictment in customary form. Or it may return a presentment, a constitutional mode fortunately no longer practiced.

To me the thing seems this simple: the Grand Jury is charged to report. It determines what it is to report. It determines the form in which it reports. Once it determines that what it wants to report is to be in the form of a true bill indictment, it obviously needs legal help. Unless its official report is to have no more significance than a presentment—a loose and ambiguous procedure which will not constitute the initiation of a prosecution—it is essential that the indictment be drawn with great care and precision. Even with the modern and proper liberality in procedural matters, both civil and criminal, the indictment to be valid must fairly assert each essential element of the crime.[7] It is a denial of all that the profession of law stands for to think that at this important juncture in its work, the Grand Jury can get along without a lawyer. The need is imperative. The source of help is restricted. It has neither the means nor the capability of obtaining or using outside counsel. The very nature of the Grand Jury proceedings makes it impermissible for private counsel to work with and participate in Grand Jury inquiries. And it is unrealistic to suppose that through some sort of controlled confrontations, the Grand Jury, or its emissaries, could disclose enough of the facts heard to permit the lawyer to draft the indictment without, at the same time, rending the veil of secrecy.

There are a number of reasons why it is essential that the Grand Jury's conclusions be reflected in language which is legally sufficient and in proper form.

First, and perhaps foremost, in no other way can the Grand Jury effectively carry out its obligations as charged to it by the Judge. An important historical body, it ought not to have to cast about for recognition or, seemingly frustrated as it was in this case, mill around the courtroom or its environs in a sort of hat-in-hand helplessness. Although, as the Court holds, the "indictment" thus returned would be ineffective without the signature of the District Attorney, re-

---

ney nor the Attorney General were required to assume that Rule 48(a) might not ultimately be construed as reserving considerable power to the District Judge himself in determining whether to enter a dismissal on the Government's motion. Actually, of course, the dissenters' concurrence on this is carefully hedged.

7. We have constantly fresh reminders of the substantive importance of the formal sufficiency of indictments. See, e. g., Russell v. United States, 1962, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240; Smith v. United States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041.

porting its conclusion in traditional legal form would do two things. First, it would clearly reflect the conscientious conclusion of the Grand Jury itself. And, second, it would, at the same time, sharply reveal the difference of view as between the Grand Jury and the prosecuting attorney.

This leads to the second important reason. The powers of the Executive are so awesome in determining those whom it will not prosecute, that where there is a difference between the Grand Jury and the Executive, this determination and the resulting conflict of views should be revealed in open court. With great power comes great responsibility. Disclosure of this difference of view and the resulting impasse would subject this decision of the Executive to the scrutiny of an informed electorate. The issue would be clearly drawn and the responsibility, both legally and in the public mind, plainly fixed. There would not be the sort of thing reflected in this record in which only in the loosest way could the public see what it was the Grand Jury purposed to do and what the Executive declined to help it to do.[8] And for future cases unless the Court holds (as it does by the concurrence of Judges Rives, Brown, Gewin and Bell) that the District Attorney must prepare the indictment form for the Grand Jury, even that limited disclosure would not be available. This is so because the Court (through another majority) holds that the trial Court may not compel the District Attorney to sign the indictment. There would thus be no occasion for, or any relief to be expected from, an oral report to the Court of the pending impasse.

By following this middle course we preserve fully the rightful independence of the Grand Jury in its inquisitorial role

and the time-proved wisdom of the separation of powers which commits determination (and responsibility) to the Executive. This route avoids the dissenters' process which at one and the same time regards the act of signing of no real consequence, as being essential to "really" initiate the prosecution, but which means nothing since the Executive may immediately demand that the Court dismiss the proceedings. Unless the dissenters anticipate that the Judge on a post-indictment Rule 48(a) motion to dismiss will undertake to determine—or appear to be doing so—whether there are "good" enough grounds for the Executive's determination not to prosecute, the public disclosure, so vital to pinpointing responsibility within the ranks of the Executive, will be no greater than the open court proceedings in which the unsigned indictment is reported together with the fact of impasse.

For these reasons I concur specially in the reversal of the contempt order, the dismissal of the Acting Attorney General's appeal, and the denial of the writ of prohibition.

WISDOM, Circuit Judge (concurring specially):

Too many opinion-writers are like too many cooks. I brave the danger of spoiling *our* broth only because the savory aroma of the competing dish the dissenters offer conceals its indigestible ingredients.

The dissenters show judicial craftsmanship of the highest order in writing persuasively about "the traditional sphere" of the grand jury while not turning up one case holding that a court may compel a prosecutor to prepare and sign a bill of indictment requested by a grand jury. Not one case in all the

---

8. Indeed, the colloquy—some of it being quoted in the early part of Rives-Gewin-Bell opinion—between the Court and the Grand Jury, the Court and the District Attorney reflects on all hands extremely guarded statements, inquiries and responses couched in the vaguest sort of language lest there be a breach of Grand Jury secrecy or an intrusion upon the part of the Court or the District Attorney into the affairs reserved exclusively to it. Only in the contempt proceedings resulting in an order which we hold to have been unauthorized was the impasse between the Executive and the Grand Jury revealed in any detail.

years between 1166 and 1965! I submit that the result reached in the dissent is the product of a misunderstanding of the historical meaning of "presentment and indictment", a failure to give effect to the difference between the sword and the shield of the grand jury,[1] and an abstract approach that disregards the factual setting in which the issue is presented.

Nothing in the position of any of the judges in the majority "ignores" or tends to diminish the purely inquisitorial role of the federal grand jury.[2] But when that role goes beyond inquiry and report and becomes accusatorial, no aura of traditional or constitutional sanctity surrounds the grand jury. The Grand Jury earned its place in the Bill of Rights by its shield, not by its sword.

## I.

The Fifth Amendment requires the grand jury's "presentment or indictment" as a prerequisite to trial for a "capital, or otherwise infamous crime". This language provides no aid and comfort to the notion that either the grand jury or the court has the power to compel prosecution once the grand jury has exercised its accusatorial function. "In fact, confusion reigns as to just what a [federal] grand jury can do. Federal statutes are silent on the relationship which is to exist between a federal grand jury, the district court which summons it, and the United States attorney's office in the district. From 1789 to the present, Congress has made no definitive statement concerning grand jury powers." [3] There is, however, "every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor".[4]

Historians usually trace the English grand jury back to the Assize of Clarendon issued by Henry II in 1166, based not on Anglo-Saxon antecedents but on Norman-French inquests.[5] The function of the early grand juries was "to dis-

1. The Federal Grand Jury Handbook, p. 8, describes the functions of the Grand Jury in these words:

 "The Grand Jury is both a sword and a shield of justice—a sword because it is the terror of criminals, a shield because it is the protection of the innocent against unjust prosecution. But these important powers obviously create equally grave responsibilities to see that such powers are in no wise perverted or abused. With its almost limitless powers, a Grand Jury might, unless motivated by the highest sense of justice, find indictments not warranted by the evidence and thus become a source of oppression to our citizens."

2. The encomia addressed to the inquisitorial role of the grand jury properly apply to the traditional common law jury or a jury in those States still giving the jury a free rein in the exercise of its inquisitorial power. Federal grand juries, as distinguished from State grand juries, do not have the power of the latter to investigate public institutions or the actions of public officials, *where they have no reason to believe that a crime has been committed.* Compare United States v. Smyth, D.C.N.D.Cal.1952, 104 F.Supp. 283 and Application of United Electrical Radio & Machine Workers

of America, D.C.S.D.N.Y.1953, 111 F. Supp. 858 with State of Florida ex rel. Brautigam v. Interim Report of Grand Jury, Fla.1957, 93 So.2d 99. Investigations by Congress and the administrative agencies lessen the need for federal juries to investigate corruption in public office. The Attorney General's tight control over local United States attorneys lessens the likelihood of a United States attorney's failing to investigate and prosecute in the proper case.

3. Comment, Powers of Federal Grand Juries, 4 Stan.L.Rev. 69 (1951). See also, Dression & Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L.J. 687 (1932).

4. Costello v. United States, 1956, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397; Russell v. United States, 1962, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240.

 In 1951 Senator Nixon introduced a bill (S. 2086, 82d Cons., 1st Sess.) defining the powers of the grand jury and providing for the appointment of a special counsel to assist any grand jury desiring to investigate any criminal action on its own initiative. The bill died in the Judiciary Committee.

5. Stephen, A History of the Criminal Law of England (1883), 185–186, 252–254; 1 Holdsworth, History of English

cover and present facts in answer to enquiries addressed to them by the King".[6] The primary purpose was to furnish the King with the names of those who were defamed by common repute, *fama publica*, an institution historically analogous to the *infamia* [7] in Roman law, both of which add content to the meaning of the phrase "infamous crimes" in the Fifth Amendment.[8] The "whole principle" of the early grand jury "was to get information useful to the Crown from those most likely to have it—the principle of the ancient inquisition." [9] This ordeal by trial avoided private prosecution by "appeal" and enabled the Crown to discover criminals who would have escaped prosecution by private parties, thereby providing another source of revenue from fines and forfeitures as well as improving the machinery for preserving law and order. The procedure was for the benefit of the Crown.

From its beginning until its abolition by Parliament in 1933,[10] the English common law presenting jury could act on its own knowledge, or on the information of others, or on the Crown's written bill of indictment. *But only when this bill was preferred to the grand jury by the Crown and endorsed as a "true bill" was the accusation known as an indictment.* This was the accepted usage when the Fifth Amendment was adopted. Blackstone explained:

"A presentment, *generally* taken, is a very comprehensive term; including not only presentments properly so called, but also inquisitions of office, and indictments by a grand jury. A presentment, *properly* speaking, is the notice taken by a grand jury of any offence from their own knowledge or observation, without any bill of indictment laid before them at the suit of the king. As, the presentment of a nuisance, a libel, and the like; upon which the officer of the court must afterwards frame an indictment, before the party present-

Laws (1956), 312–323; 2 Pollock and Maitland, History of English Law Before The Time of Edward I (1959), 642–647; Plucknett, History of the Common Law (1956), 111–120.

6. Holdsworth, supra, n. 5, 321.

7. The Roman infamia was: " * * * a moral censure pronounced by a competent authority in the State on individual members of the community, as a result of certain actions which they had committed, or certain modes of life which they had pursued, this censure involving disqualification for certain rights both in public and in private law." Greenidge, Infamia (1897), 37.

8. Franklin, Infamy and Constitutional Civil Liberties, 14 Law.G.Rev. 1 (1954); Franklin, Roman Law and The Constitution, 38 Tul.L.Rev. 621, 623–26, 641 (1964).

9. Plucknett, supra, 126.

10. Great law reformers have criticized the grand jury as an anachronism in a modern government and as subject to abuse because of its secrecy. Most of the criticism has been directed at the grand jury's inquisitorial power. And most of the criticism came before the totalitarian movement of recent years. Jeramy Bentham, 3 Rationale of Ju-

dicial Evidence c. 15, § II; Edward Livingston, Complete Works (1873) I–372, II–249–250; Pound & Frankfurter, Criminal Justice in Cleveland (1922) 176, 211–212, 248; Wayne Morse, A Survey of the Grand Jury System, 10 Ore.L.Rev. 101, 239 (1931); Pound, Criminal Justice in American (1930) 109, 186; Moley, Politics and Criminal Prosecution (1929), 127–128; Wickersham Commission, Report on Prosecution of the National Commission on Law Observance and Enforcement (1931) 34, 125; Willoughby, Principles of Judicial Administration, (1929) 180–194. Section 113 of the A.L.I. Code of Criminal Procedure provides that all offenses heretofore required to be prosecuted by indictment may be prosecuted either by indictment or information. In 10 states the Constitution allows the legislature to modify or abolish the grand jury. Senator, then Professor, Morse found that in 1931 twenty-six states did not require indictment by the grand jury. Model Code of Criminal Procedure, Appendix 414–31. But see Dression, From Indictment to Information, 42 Yale L.J. 163 (1932); Younger, The Grand Jury Under Attack, 46 Journ. Crim.L.C. & P.S. 26, 215 (1955); Hall, Analysis of Criticism of the Grand Jury, 22 J.Crim.L. 692, 699–700 (1932).

ed can be put to answer it. * * * An *indictment* is a written accusation of one or more persons of a crime or misdemeanor, preferred to, and presented upon oath by, a grand jury. * * * When the grand jury have heard the evidence, if they think it a groundless accusation, they used formerly to endorse on the back of the bill, '*ignoramus;*' or, we know nothing of it; intimating, that though the facts might possibly be true, that truth did not appear to them: but now, they assert in English, more absolutely, 'not a true bill;' or (which is the better way) 'not found;' and then the party is discharged without farther answer. * * * If they are satisfied of the truth of the accusation, they then endorse upon it, 'a true bill,' antiently, '*billa vera.*' The indictment is then said to be found, and the party stands indicted." Blackstone's Commentaries, Vol. IV, C. XXIII, pp. 301, 302, 305. (Italics supplied by the Editor, St. George Tucker, in the First American edition, 1803).

The Fifth Amendment, therefore, does not offer a grand jury a choice between presentment or indictment. Unless there is a bill of indictment preferred to the grand jury at the instance of the Government, there can be no indictment. It is entirely in the hands of the Government whether to submit an accusation to the grand jury leading to presentment in the form of an indictment and serving as the initial pleading in a criminal prosecution. , · ·

Professor Orfield finds the distinctions between indictment and presentment "confusing" as, no doubt, they are—today. His explanation of the terms is substantially similar to Blackstone's:

"Both indictment and presentment are 'presented' to the court. Both

are accusations. The presentment, however, is made by the grand jury. An indictment, on the other hand, is someone else's accusation which has been drawn up into a bill of indictment and preferred to the grand jury, who examine the evidence in support of it and then find it to be a true bill. In finding an indictment the grand jury is playing the role of a prosecutor. For that reason a presentment must be drawn up into a bill of indictment and resubmitted to the grand jury." Orfield, Criminal Procedure from Arrest to Appeal, 157 (1947).[11]

Professor Orfield concedes that there may be some argument that the Fifth Amendment uses the term "presentment" as an alternative for "indictment". However, he writes:

"[I]f the term ["presentment"] is used in the Fifth Amendment with the meaning it had *when the Constitution was adopted,* it means a statement of facts by grand jurors upon which an indictment would be subsequently framed by a United States attorney, or it may mean an accusation by the grand jurors upon presentment of facts to them by a special prosecutor acting for a private individual. But it is no longer used in the federal courts because of the constant availability of a United States attorney to assist the grand jury and because of the decline of prosecution by private individuals." Ibid. 158. (Emphasis supplied.)

Criminal presentment based on the grand jury's own knowledge or on knowledge furnished by others may be in disuse in federal courts, but it has not been read out of the Constitution. Hale v. Henkel, 1906, 201 U.S. 43, 62, 26 S.Ct. 370, 50 L.Ed. 652.[12] See also Blair v. United States, 1919, 250 U.S. 273, 280,

11. Similarly, Wharton states: "In its stricter meaning a presentment has been said to be an accusation by the grand jury *sua sponte,* made *ex mero moto,* whereas an indictment is a written accusation, preferred to the grand jury and presented upon oath *at the instance of the Government.*" 4 Wharton, Criminal Procedure (1957) § 1713, p. 471.

12. In Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, Hale was called to testify before a grand jury, refused to do so,

39 S.Ct. 468, 63 L.Ed. 979 and Sullivan v. United States, 1954, 348 U.S. 170, 173, 75 S.Ct. 182, 99 L.Ed. 210; Kuh, The Grand Jury "Presentment"; Foul Blow or Fair Play, 55 Col.L.Rev. 1103 (1955).

Presentment is a natural corollary to the grand jury's inquisitorial power, either for an inquisition of office or for a prosecutory purpose. Its use here would not accomplish its prosecutory purpose, because the Attorney General still could decline to submit a bill of indictment to the grand jury. On the other hand, in this case a presentment in open court with an appropriate minute entry would meet many of the objections to the government's position raised in the dissenting opinion and Judge Brown's opinion. Subject to the qualification that the United States Attorney is bound by his instructions from the Attorney General not to prosecute Goff and Kendrick, and therefore could not draw bills indicting them, I see no objection to his rendering other services within his ordinary duties as the legal advisor to the jury. Aborting of the criminal presentment would, in effect, convert it into the familiar inquisition of office "employed for centuries to designate the findings of a grand jury with respect to derelictions in matters of public concern, particularly of officials, which may fall short of being criminal offenses".[13] This use of presentment would be in accord with the established procedure in the common law and with the original understanding of the framers. I consider it preferable to the placebo the Government suggests: an indictment (which is not an indictment) to lie fallow until some day another Attorney General might or might not come along to vitalize it.

In sum, there is nothing in my view or in that of the other judges in the majority that would, as the dissenting judges assert, authorize Government counsel to "radically reduce the powers of the grand jury". *The grand jury nevr had a plenary power to indict.* It had a limited power to indict—after accusation by the Crown or the Government in the form of a bill of indictment preferred to the grand jury. The common law oath of a grand juror, as Justice Vanderbilt has pointed out, "says not a single word about indictments; on the contrary, at common law the grand jury swore to 'diligently inquire and true presentments make'. See Shaftesbury Trial, 8 St.Tr. 759." [14] The oath a federal grand juror takes today is identical with the common law oath in its avoidance of any reference to "indictment".

The decision of the majority does not affect the inquisitorial power of the grand jury. No one questions the jury's plenary power to inquire, to summon and interrogate witnesses, and to present either findings and a report or an accusation in open court by presentment.

Finally, the decision does not affect the power of the grand jury to shield suspected law violators. By refusing to indict, the grand jury has the unchal-

and was adjudged in contempt. He argued, in seeking release from custody on habeas corpus, that the grand jury was powerless to make any inquiry in his case since it was not acting pursuant to a particular charge. (There was no question of prosecutor's non-cooperation in that case; there simply was no formal charge prior to the grand jury's investigation.) The following language of the Court carries a strong implication that the prosecutor is entitled to refuse to prepare a bill of indictment:

"'If the grand jury * * * from the examination of witnesses, know of any offense committed in the county, for which no indictment is presented to them, it is their duty either to inform the officer who prosecutes for the state, of the nature of the offense, and desire that an indictment for it be laid before them, or, if they do not, or, if no such indictment be given them, it is their duty to give such information of it to the court; stating, without any particular form, the facts and circumstances which constitute the offense. This is called a presentment.'"

13. In re Presentment By Camden County Grand Jur. 1952, 10 N.J. 23, 89 A.2d 416, 423.

14. Ibid. 89 A.2d at 426.

lengeable power to defend the innocent from government oppression by unjust prosecution. And it has the equally unchallengeable power to shield the guilty, should the whims of the jurors or their conscious or subconscious response to community pressures induce twelve or more jurors to give sanctuary to the guilty.

## II.

Because recognition of the grand jury's shield-like function is lodged in the Bill of Rights, the bedrock of basic rights, it is fair to say that national policy favors a liberal construction of the power of the grand jury to protect the individual against official tyranny. No such policy favors the grand jury in its accusatorial role. Accordingly, we look for and should expect to find a check on its unjust accusations similar to the grand jury's check on the government's unjust accusations.

If there is one aspect of the doctrine of Separation of Powers that the Founding Fathers agreed upon, it is the principle, as Montesquieu stated it: "To prevent the abuse of power, it is necessary that by the very disposition of things, power should be a check to power".[15] Taking their institutions as they found them, the framers wove a web of checks and balances designed to prevent abuse of power, regardless of the age, origin, and character of the institution. At the same time, the framers were too sophisticated to believe that the three branches of government were absolutely separate, air-tight departments.[16] It does not mat-

ter, therefore, whether the grand jury is regarded as an arm of the court, as the Federal Grand Jury Handbook states,[17] or is regarded as a *sui generis* institution derived from the people. What does matter is that the power of the executive not to prosecute, and therefore not to take steps necessarily leading to prosecution, is the appropriate curb on a grand jury in keeping with the constitutional theory of checks and balances. Such a check is especially necessary, if there is any question of the grand jury's and the district court's being in agreement; if they differ, of course the district court may dismiss the grand jury. The need is rendered more acute if there is a possibility that community hostility against the suspected offenders, individually or as a race, may jeopardize justice before the petit jury. In short, if we give the same meaning to "presentment or indictment" that Madison and others gave to these terms when Madison introduced the Bill of Rights in the First Congress, the grand jury provision in the Bill of Rights cuts both ways: it prevents harassment and intimidation and oppression through unjust prosecution—by the Grand Jury or by the Government.

## III.

The prosecution of offenses against the United States is an executive function within the exclusive prerogative of the Attorney General. "There shall be at the seat of government an executive department to be known as the Department of Justice, and an Attorney General, who shall be the head thereof." 5 U.S.C. §

15. Montesquieu, The Spirit of Laws (Edinburgh, 1772) Bk. XI, C. IV.

16. Madison, for example, wrote in No. 47 of the Federalist: "[I]t may clearly be inferred that, in saying, 'There can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates,' or, 'if the power of judging be not separated from the legislative and executive powers,' he (Montesquieu) did not mean that these departments ought to have no *partial agency* in, or no *control* over, the acts of each other. His meaning, as his own words import, and still more

conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted."

17. Federal Grand Jury Handbook, p. 9. See, In re Presentment by Grand Jury of Ellison, D.C.D.Del. 1942, 44 F.Supp. 375, aff'd 133 F.2d 903, cert. den'd In re Ellison, 318 U.S. 791, 63 S.Ct. 995, 87 L.Ed. 1157.

291. That official, the chief law-enforcement officer of the Federal Government is "the hand of the president in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings and in the prosecution of offenses be faithfully executed." Ponzi v. Fassenden, 1922, 258 U.S. 254, 262, 42 S.Ct. 309, 311, 66 L.Ed. 607. He "has the authority, and it is made his duty, to supervise the conduct of all suits brought by or against the United States", including the authority "to begin criminal prosecution". United States v. San Jacinto Tin Co., 125 U.S. 273, 278–279, 8 S.Ct. 850, 31 L.Ed. 747. He "is invested with the general superintendence of all such suits, and all the district attorneys who do bring them in the various courts in the country are placed under his immediate direction and control." Id., p. 279, 8 S.Ct. at p. 853, and see In re Neagle, 135 U.S. 1, 66, 10 S.Ct. 658, 34 L.Ed. 55.

"[T]he district attorney has absolute control over criminal prosecutions, and can dismiss or refuse to prosecute, any of them at his discretion. The responsibility is wholly his." United States v. Woody, D.C.Mont.1924, 2 F.2d 262. The determination of whether and when to prosecute "is a matter of policy for the prosecuting officer and not for the determination of the courts". District of Columbia v. Buckley, 1942, 75 U.S.App. D.C. 301, 128 F.2d 17. As another court has stated it:

"All of these considerations point up the wisdom of vesting broad discretion in the United States Attorney. The federal courts are powerless to interfere with his discretionary power. The Court cannot compel him to prosecute a complaint, or even an indictment, whatever his reasons for not acting. The remedy for any dereliction of his duty lies, not with the courts, but, with the executive branch of our government and ultimately with the people." Pugach v. Klein, S.D.N.Y.1961, 193 F.Supp. 630, 635.

"Congress, well aware of this discretion has never challenged its existence." Schwartz, Federal Criminal Jurisdiction and Prosecutors' Discretion, 13 L. & Cont. Prob. 64, 83 (1948).[18]

In the Confiscation Cases, 7 Wall. 454, 19 L.Ed. 196 (1868) the Supreme Court, over the objection of informers entitled to fees, allowed the Attorney General, in his discretion, to dismiss libels for the criminal condemnation of certain vessels under a statute permitting the seizure and condemnation of property knowingly used to aid insurrection against the United States. The statute made it the duty of the President to see to it that such property was seized and condemned. The Court relied not only upon the statutory authority of the Attorney General to control all prosecutions and civil actions brought by or against the United States, but also upon common law principles:

"Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney,

---

18. Schwartz points up his comment with this significant illustration: "In the hearing on the confirmation of Attorney General Jackson as Associate Justice of the Supreme Court, the nomination was attacked because of Jackson's failure to prosecute Drew Pearson and Robert S. Allen for criminal libel on Senator Tydings. Jackson had taken the position that it was the policy of the Department of Justice to avoid the criminal libel laws when the courts were open to the injured party in civil proceedings, *and that prosecutions of this character would tend to impair freedom of the press.* (Emphasis supplied.) Republican Senator (now Mr. Justice) Burton stated:

"'The prosecuting attorney, being charged, as he is charged, with the great responsibility of deciding under the laws of the United States, the laws under which he is serving, whether a case should be prosecuted, owes a duty to himself, his community, and the Constitution to decide whether the case should be prosecuted. * * * In my judgment the Attorney General was within his rights when he declined to prosecute, and in stating the grounds as he did state them under the circumstances.'"

13 L. & Const.Prob. at 83.

\* \* \* Settled rule is that those courts will not recognize any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business in his absence, as may appertain to the duties of his office."

The functions of prosecutor and judge are incompatible. In United States v. Thompson, 1920, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333, for example, the Supreme Court reversed a lower court for attempting to prevent a United States Attorney from instituting criminal prosecution by resubmitting the matter to a grand jury. The Court's decision was expressly based upon "the absolute right of the United States to prosecute," and upon "the right of the Government to initiate prosecutions for crime", a right not subject to control by judicial discretion. 251 U.S. at 412–413, 415. Similarly, the Court has held that a district court was without jurisdiction to refuse to issue a warrant of arrest upon an indictment by a grand jury upon the application of the United States Attorney, because such refusal would bar " 'the absolute right of the United States to prosecute' " and would bar "the lawful authority of the United States Attorney." Ex parte United States, 1932, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283.

In Goldberg v. Hoffman, 7 Cir. 1955, 225 F.2d 463, a petition for mandamus was filed against the Attorney General, an Assistant Attorney General, and the United States Attorney, to compel them to relieve the petitioner of an indictment. The Court of Appeals dismissed as to the Attorney General and Assistant Attorney General for lack of jurisdiction:

"Our adjudication of the issues raised must be guided by considerations inherent in the well-settled principle of the separation of the powers vested in the three branches of government, which is the keynote of our constitutional mandate. We must bear in mind that the United States Attorney is an officer of the executive branch responsible primarily to the President, and, through him, to the electorate, and that the remedy sought against Tieken is a broad one, to-wit, a direct mandate from this court compelling him to take, or refrain from taking, a specific course of action with respect to the indictment pending against petitioner. More specifically, we are asked to review the exercise of administrative discretion, overrule the decision of the executive and direct the course which that discretion must take. We think such judicial control of an executive officer is beyond the power of this court." 225 F.2d at 464.

See also Moses v. Kennedy, D.C.1963, 219 F.Supp. 762, appeal pending.

In United States v. Brokaw, S.D.Ill. 1945, 60 F.Supp. 100 the court denied a motion for leave to file a petition as amicus curiae asking the court to enter an order directing the United States Attorney to show cause why an order of *nolle prosequi* should not be vacated and the cause reinstated and set for trial. The court said:

"That the United States District Attorney in his capacity as the public prosecutor in his district is clothed with the power and charged with the duties of the Attorney General in England under the common law is generally recognized and supported by the Federal courts. United States v. Thompson, 1920, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333; \* \* He is the representative of the public in whom is lodged a discretion which is not to be controlled by the courts, or by an interested individual, or by a group of interested individuals who seek redress for wrongs committed against them by use of the criminal process. In United States v. Thompson, supra, the Supreme Court held that the Federal courts have no power to control the initia-

tion of criminal proceedings, that being the prerogative and duty of the United States District Attorney." Thus, "courts generally refuse to order the prosecutor to initiate a prosecution on the ground that it is a discretionary act which may not be compelled by mandamus." Note, Prosecutor's Discretion, 103 Pa.L.Rev. 1057, 1058 (1955).

Rule 48(a) does not directly apply to the present case, because there has been no indictment, information, or complaint, but since the rule preserves the prosecutor's discretion to dismiss a complaint before indictment, the drafters of the Rules must have intended to preserve the discretion not to prosecute. In this case, the prosecutor cannot move to dismiss; there is nothing to dismiss. What he can do, however, is to refuse to prepare and sign the indictment. Under this theory, Rule 7(c), requiring that the indictment be signed by the United States Attorney, preserves the prosecutor's traditional discretion as to whether to initiate prosecution.

The reason for vesting discretion to prosecute in the Executive, acting through the Attorney General is twofold. First, in the interests of justice and the orderly, efficient administration of the law, some person or agency should be able to prevent an unjust prosecution. The freedom of the petit jury to bring in a verdict of not guilty and the progressive development of the law in the direction of making more meaningful the guarantees of an accused person's constitutional rights give considerable protection to the individual before and after trial. They do not protect against a baseless prosecution. This is a harassment to the accused and an expensive strain on the machinery of justice. The appro-priate repository for authority to prevent a baseless prosecution is the chief law-enforcement officer whose duty, *unlike the grand jury's duty, is to collect evidence on both sides of a case.*

Second, when, within the context of law-enforcement, national policy is involved, because of *national security,* conduct of foreign policy, or a conflict between two branches of government, the appropriate branch to decide the matter is the executive branch. The executive is charged with carrying out national policy on law-enforcement and, generally speaking, is informed on more levels than the more specialized judicial and legislative branches. In such a situation, a decision not to prosecute is analogous to the exercise of executive privilege. The executive's absolute and exclusive discretion to prosecute may be rationalized as an illustration of the doctrine of separation of powers, but it would have evolved without the doctrine and exists in countries that do not purport to accept this doctrine.[19]

## IV.

This brings me to the facts. They demonstrate, better than abstract principles or legal dicta, the imperative necessity that the United States, through its Attorney General, have uncontrollable discretion to prosecute.

The crucial fact here is that Goff and Kendrick, two Negroes, testified in a suit by the United States against the Registrar of Clarke County, Mississippi, and the State of Mississippi, to enforce the voting rights of Negroes under the Fourteenth Amendment and the Civil Rights Act. United States v. Ramsey, 5 Cir. 1964, 331 F.2d 824; rev'd on reh'g, 331 F.2d 838.

19. "Hobbes told us long ago, and everybody now understands that there must be a supreme authority, a conclusive power, in every state on every point somewhere." Bagehot, The English Constitution (1872) p. 248.

"The power to determine whether a case shall be prosecuted to a conclusion must, of course, be lodged somewhere, and by common law the district attor-

ney is made its repository. By no statute has Congress deprived him of it, in ordinary criminal cases. It is assumed he will exercise his power under a heavy sense of duty to enforce the law, to prosecute offenders, and to protect society, and with wisdom and justice." United States v. Woody, D.C.Mont.1924, 2 F.2d 262.

Goff and Kendrick testified that some seven years earlier at Stonewall, Mississippi, the registrar had refused to register them or give them application forms. They said that they had seen white persons registering, one of whom was a B. Floyd Jones. Ramsey, the registrar, testified that Jones had not registered at that time or place, but had registered the year before in Enterprise, Mississippi. He testified also that he had never discriminated against Negro applicants for registration.[20] Jones testified that he was near the registration table in Stonewall in 1955, had talked with the registrar, and had shaken hands with him. The presiding judge, Judge W. Harold Cox, stated from the bench that Goff and Kendrick should be "bound over to await the action of the grand jury for perjury".[21]

In January 1963 attorneys of the Department of Justice requested the Federal Bureau of Investigation to investigate the possible perjury. The FBI completed a full investigation in March 1963 and referred the matter to the Department's Criminal Division. In June 1963 the Criminal Division advised the local United States Attorney, Mr. Hauberg, that the matter presented "no basis for a perjury prosecution". Mr. Hauberg informed Judge Cox of the Department's decision. Judge Cox stated that in his view the matter was clearly one for the grand jury and that he would be inclined, if necessary, to appoint an outside attorney to present the matter to the grand jury. (I find no authority for a federal judge to displace the United States Attorney by appointing a special prosecutor.) On receiving this information, the Criminal Division again reviewed its files and concluded that the charge of perjury could not be sustained. General Katzenbach, then Deputy Attorney General, after reviewing the files, concurred in the Criminal Division's decision. In September 1963 General Katzenbach called on Judge Cox as a courtesy to explain why the Department had arrived at the conclusion that no perjury was involved. Judge Cox, unconvinced, requested the United States Attorney to present to the grand jury the Goff and Kendrick cases, which he regarded as cases of "palpable perjury".

20. Judge Cox found "as a fact from the evidence that negro citizens have been discriminated against by the registrar", although he found also that there was "no pattern or practice of discrimination". In its original opinion in the Ramsey case this Court noted the "testimony which witness by witness convicts Ramsey of palpable discrimination." United States v. Ramsey, 5 Cir. 1964, 331 F.2d 824, 826. In his opinion Judge Rives noted that "This case reveals gross and flagrant denials of the rights of Negro citizens to vote." 331 F.2d at 833. And on rehearing, this Court ruled that the finding that "there was no pattern or practice in the discrimination by the Registrar" was "clearly erroneous." 331 F.2d at 838. No one has suggested that Mr. Ramsey may have been guilty of perjury.

21. When counsel for the State, Mr. Riddell, completed Mr. Ramsey's direct examination, and before his cross-examination, respondent Judge W. Harold Cox, who was presiding, stated:

"I want to hear from the government about why this Court shouldn't require this Negro Reverend W. G. Goff and his companion Kendrick to show cause why they shouldn't be bound over to await the action of the grand jury for perjury. I want to hear from you on that.

\*　　\*　　\*　　\*　　\*

"I think they ought to be put under about a $3,000.00 bond each to await the action of a grand jury. Unless I change my mind that is going to be the order.
"BY MR. STERN [Government counsel]: I will be happy to reconcile their testimony.
"BY THE COURT: I just want these Negroes to know that they can't come into this Court and swear to something as important as that was and is and get by with it. I don't care who brings them here.
"BY MR. STERN: I understand.
"BY THE COURT: Yes sir. And I mean that for whites alike, but I am talking about the case at hand. I just don't intend to put up with perjury. That is something I will not tolerate. All right."

In October 1963 Goff and Kendrick were arrested, jailed for two days, and placed on a $3,000 bond for violations of State law for falsely testifying in federal court. After their indictment by a state grand jury, the Department of Justice filed suit against the State District Attorney, United States v. Warner, (Civ. No. 1219, S.D.Miss.), seeking to enjoin the state prosecution on the grounds that: (1) the States have no authority to prosecute for alleged perjury committed while testifying in a federal court; (2) the purpose and effect of the State's prosecution was to threaten and intimidate Goff and Kendrick and to inhibit them and other Negroes from registering to vote. See United States v. Wood, 5 Cir. 1961, 295 F.2d 772; Harvey v. State of Mississippi, 5 Cir. 1965, 340 F.2d 263. The district court (per Mize, J.) ruled in favor of the United States, citing In re Loney, 1890, 134 U.S. 372, 10 S.Ct. 584, 33 L.Ed. 949, and 42 U.S.C. § 1971 (b) prohibiting intimidation for the purpose of interfering with voting rights.

The Federal Grand Jury, originally convened on September 9, 1963, was reconvened on September 21, 1964. September 28, 1964, the Foreman of the Grand Jury advised the Government Attorney who was presenting matters to the Grand Jury that Judge Cox had asked the Foreman to hear several witnesses. September 29, 1964, Mr. Riddell, attorney for the Registrar, and the district attorney for the Second Circuit District for the State of Mississippi, Mr. Holleman, came to the courthouse to appear before the Grand Jury. Judge Mize, in a special charge to the Grand Jury stated —in open court—that Judge Cox had informed him, before leaving for his vacation, that:

"* * * he wanted the Grand Jury to call before it Mr. Boyce Holleman of Gulfport, Mississippi and Mr. Talley [sic] Riddell of Quitman, Mississippi as witnesses, because it was his impression that they had some matters that ought to be investigated at least and that they should be permitted to appear."

Judge Mize stated that he was not familiar with the matters "other than just what Judge Cox requested me to do, to see to it that these two witnesses had an opportunity to appear before the Grand Jury." Judge Mize advised the Grand Jury that they had a right to hear the testimony of Messrs. Riddell and Holleman, but requested them not to do so until October 21, 1964, the day after Judge Cox was to return from his vacation.

October 20 Mr. Katzenbach talked with Judge Cox by telephone, reiterating the Department's position. He also instructed Mr. Hauberg not to prepare or sign indictments. October 22 the foreman of the grand jury in open court informed Judge Cox that Mr. Hauberg had declined to assist in preparing true bills. The United States Attorney stated that "the Department of Justice and the United States felt as if that the law and the fact was not sufficient to constitute perjury and that an indictment thereon would be no good." Judge Cox said:

"I here and now order and direct you to disregard your instructions from the Department of Justice and to prepare true bills or no bills as this Grand Jury may direct you to do and to sign those bills or no bills, as the Grand Jury may decide under penalty of contempt, * * *."

Judge Cox recessed court for one hour. During this recess Mr. Hauberg and Mr. Katzenbach conferred by telephone; the Attorney General directed the United States Attorney not to prepare or sign perjury indictments of Goff and Kendrick. Court reopened. Mr. Hauberg respectfully declined to comply with the court's order. Judge Cox forthwith adjudged him "guilty of civil contempt", ordered him confined to a jail in Hinds County, ordered the issuance of a citation to the Acting Attorney General to appear before the court to show cause why he should not be held in contempt; and stayed the order for a period of five days.

* * *

Against the backdrop of Mississippi versus the Nation in the field of civil rights, we have a heated but bona fide difference of opinion between Judge Cox and the Attorney General as to whether two Negroes, Goff and Kendrick, should be prosecuted for perjury. Taking a narrow view of the case, we would be justified in holding that the Attorney General's implied powers, by analogy to the express powers of Rule 48(a), give him discretion to prosecute. Here there was a bona fide, reasonable exercise of discretion made after a full investigation and long consideration of the case—both sides of the case, not just the evidence tending to show guilt. If the grand jury is dissatisfied with that administrative decision, it may exercise its inquisitorial power and make a presentment in open court.[22] It could be said, that is all there is to the case. But there is more to the case.

This Court, along with everyone else, knows that Goff and Kendrick, if prosecuted, run the risk of being tried in a climate of community hostility. They run the risk of a punishment that may not fit the crime. The Registrar, who provoked the original litigation, runs no risk, notwithstanding the fact that the district court, in effect, found that Ramsay did not tell the truth on the witness stand. In these circumstances, the very least demands of justice require that the discretion to prosecute be lodged with a person or agency insulated from local prejudices and parochial pressures. This is not the hard case that makes bad law. This is the type of case that comes up, in one way or another, whenever the customs, beliefs, or interests of a region collide with national policy as fixed by the Constitution or by Congress. It is not likely that the men who devised diversity jurisdiction expected to turn over to local juries the discretionary power to bring federal prosecutions. This case is unusual only for the clarity with which the facts, speaking for themselves, illuminate the imperative necessity in American Federalism that the discretion to prosecute be lodged in the Attorney General of United States.

The decision not to prosecute represents the exercise of a discretion analogous to the exercise of executive privilege. As a matter of law, the Attorney General has concluded that there is not sufficient evidence to prove perjury. As a matter of fact, the Attorney General has concluded, as he pleaded in United States v. Warner, that trial for perjury would have the effect of inhibiting not only Goff and Kendrick but other Negroes in Mississippi from registering to vote. There is a conflict, therefore, between society's interest in law enforcement (diluted in this case by the Attorney General's conclusion that the evidence does not support the charge of guilt) and the national policy, set forth in the Constitution and the Civil Rights Acts, of outlawing racial discrimination. It is unthinkable that resolution of this important conflict affecting the whole Nation should lie with a majority of twenty-three members of a jury chosen from the Southern District of Mississippi. The nature of American Federalism, looking to the differences between the Constitution and the Articles of Confederation, requires that the power to resolve this question lie in the unfettered discretion of the President of United States or his deputy for law enforcement, the Attorney General.

My memory, too, goes back to the days, pointedly referred to by the dissenters, when we had "an Attorney General suspected of being corrupt." But I am not aware that we have had more lawless Attorneys General than lawless juries.

22. Younger points out, however, that every known instance of an impasse after presentment was resolved by political action. In one instance Theodore Roosevelt, then governor of New York, removed a district attorney from office who had refused to prosecute. Younger, The People's Panel: The Grand Jury in The United States, 1634–1941, at 188–90 (1963).