**In re Presentment of Special GRAND JURY Impaneled JANUARY, 1969.**

**Petitions of John DOE et al., to Suppress and Expunge.**
**Misc. No. 713.**

United States District Court,
D. Maryland.
June 22, 1970.

George Beall, U. S. Atty., Paul R. Kramer, Dep. U. S. Atty., Baltimore, Md., and Michael Abbell, Attorney, Department of Justice, Washington, D. C., for the Government.

Paul R. Connolly, Harold Ungar and Williams & Connolly, Washington, D. C., William L. Marbury, John Martin Jones, Jr., George A. Nilson and Piper & Marbury, Norman P. Ramsey, Thomas J. S. Waxter, Jr., and Semmes, Bowen & Semmes, Baltimore, Md., and William G. Hundley and Hundley & Peloquin, Washington, D. C., for petitioners.

Melvin J. Sykes, Baltimore, Md., amicus curiae by appointment of the Court.

THOMSEN, Chief Judge *.

A Special Grand Jury impaneled by Judge Kaufman of this Court in January 1969 has been investigating certain matters brought to its attention by the United States Attorney then in office, Stephen H. Sachs, and has returned a number of indictments not relevant here.

For many months newspapers and other media in Baltimore and Washington have reported that the Grand Jury was investigating the activities of various persons in connection with the claims of Baltimore Contractors, Inc., arising out of the construction by that company of the Rayburn Garage in Washington, D. C., for the United States.

The media have also suggested that various persons holding public office were involved, and some of those persons have issued public statements denying their involvement. Others have remained silent. They should not be criticized or suspected of wrongdoing because they have not answered anonymous suggestions.

On May 28, 1970, in open court, the Deputy Foreman of the Grand Jury [1] read to the Court from a paper captioned "Presentment", which stated that in the course of the investigation conducted by the Grand Jury, they had heard from a great many witnesses and reviewed many documents which had been presented to them for consideration, and that the Grand Jury was prepared to return an indictment charging certain defendants with violations of the laws of the United States in this district. He said that the United States Attorney, Stephen H. Sachs, concurred, but that Mr. Sachs had advised him that the Attorney General had so far refused to authorize him to sign an indictment the Grand Jury believed to be appropriate.

The Deputy Foreman said the Grand Jury had been advised that in the absence of the signature of the United States Attorney or of some other attorney acting on behalf of the United States, the indictment they were prepared to return would be of no effect. He further said that in view of the foregoing, and pursuant to a secret vote conducted by the Grand Jury, the results of which were sealed in an attached envelope, the Grand Jury was now exercising what they claimed to be their power to return a presentment to this Court, based on the investigation they had conducted during their term, and requested that formal charges identical or substantially similar to the draft indictment they were presenting to the Court be drawn and signed by appropriate officials of the Department of Justice.

The Deputy Foreman then delivered to the Court two sealed envelopes, one containing a form of a proposed indictment not signed by either the Deputy Foreman or the United States Attorney, and one containing a certification of the number of Grand Jurors who voted for the Presentment.

United States Attorney Sachs then stated that he confirmed the statements as to his views and the refusal of the Department of Justice up to that time to authorize his signature.

The Court had been told the day before by the United States Attorney that the Grand Jury intended to make a presentment.[2] The Court had made a necessarily brief examination of the law, including a careful reading of the four opinions in United States v. Cox, 342 F. 2d 167 (5 Cir. 1965). Those opinions state divergent views on many of the questions raised.

The Court made the following reply to the Grand Jury: "I know of no clear

---

* Delivered orally in open court, and edited.

1. The original foreman has moved out of the district for business reasons and the deputy foreman thereafter served as foreman with the approval of the Court.

2. The Court did not know until it opened the sealed envelope what charges the Grand Jury desired to press or whom they proposed to indict, and therefore no counsel for anyone named had been notified.

binding authority as to whether this presentment should be made public or should be kept secret. There are arguments in favor of making it public and arguments in favor of keeping it secret. Therefore, I am delivering it to the Clerk to keep the sealed presentment in his safe for the time being, at least. I instruct Mr. Sachs to send a copy of the presentment with the exception of the sealed vote to the Attorney General. The Court suggests to the Attorney General that after giving it consideration he make through his representatives whatever response to the Grand Jury he deems appropriate. In any event, the Court instructs the Attorney General to inform the Court within one week from today whether the Department of Justice wishes the Court to keep the presentment secret or to make it public. After hearing from the Department and considering all relevant factors, the Court will decide whether the presentment should be made public or kept secret. In the meantime, members of the Grand Jury, as you know from your long service here, you should not divulge the contents of the presentment or anything in connection therewith to anyone unless and until you are told by the Court that you may do so."

Several weeks before May 28, Mr. Sachs had announced that he was resigning as United States Attorney, effective May 30, to resume private practice. On June 1 the Judges of this Court unanimously appointed George Beall to be United States Attorney for this District, pursuant to 28 U.S.Code sec. 546. On June 3 the Government, by the United States Attorney and Michael Abbell, Attorney, Department of Justice, who had aided the United States Attorney in the investigation, moved that the Court's decision with respect to the unsealing of the presentment be postponed until June 17, in order to afford the new United States Attorney sufficient opportunity to review the matter and to afford the Department of Justice

an opportunity to continue its own review, so that a prompt determination could be made upon the receipt of Mr. Beall's recommendation.

The Government also stated that it was desirable that any decision reached by the United States Attorney and the Department of Justice be discussed with the Grand Jury prior to the Court's rendering its decision on the unsealing of the Presentment; and because the Grand Jury was not scheduled to convene until June 10, the Government requested that the Court postpone its decision until at least that date.

However, for the reasons stated above, the Government took the position that merely postponing the decision on the unsealing of the presentment until June 10 would not afford an adequate opportunity to reach a determination as to the manner in which it wished to proceed, and therefore requested the Court to defer the next meeting of the Grand Jury until June 17, 1970, and to postpone its decision on the unsealing of the presentment until after that meeting.

The Court agreed that the decision on the unsealing of the presentment should be postponed until June 17, but did not agree that the meeting of the Grand Jury be postponed, stating: "It seems highly desirable that Mr. Beall, the new United States Attorney for this District, who has not yet met with that Grand Jury, meet with them on June 10 and hear their views before making his final recommendation to the Attorney General".

Mr. Beall met with the Special Grand Jury on June 10. Toward the end of that meeting the Deputy Foreman and Mr. Beall left the jury room, came to the Court in camera and told the Court that the Grand Jury wished to find and return an indictment, whether or not it was signed by the United States Attorney. Acting upon the authority of a majority of the judges in United States v. Cox, supra,[3] the Court advised the

3. Judges Rives, Gewin, Bell and Brown.

Deputy Foreman in the presence of the United States Attorney that the United States Attorney was permitted and perhaps required to prepare a proposed indictment, as requested by the Grand Jury, but that the Court could not require him to sign it, and that the effect of an "indictment" not signed by an attorney for the Government was not clear.

On June 15, after their counsel had told the Court on June 12 that they intended to do so, John Doe, Richard Roe and Peter Poe filed a Petition in this Court under Rule 47, F.R.Crim.P., stating that they had reason to believe that each had been the subject of investigation by the Special Grand Jury of this District impaneled in January 1969, and that each is prominently mentioned by his correct name in a certain paper delivered sealed to this Court under date of May 28, 1970, and asking the Court "for an order suppressing from public disclosure and expunging from the records of this Court that certain report entitled 'Presentment', and its attachments, Exhibits A and B, made on May 28, 1970 by Warren Taylor, Deputy Foreman of the Special Grand Jury of January 1969", for reasons which were more fully developed in an attached memorandum in support of the Petition.[4]

One of the attorneys who signed the Petition asked the Court whether the hearing on the Petition and any further proceedings in connection with the matter could be held in camera rather than in open court. The Court refused to commit itself so broadly at that time, but assured counsel that no action disclosing the names of any petitioners charged or mentioned in the indictment

---

4. The reasons given in support of the requested order were:

"1. This Court, on May 28, 1970, in a public statement concerning the Special Grand Jury Report erroneously suggested that it possessed authority to unseal the enclosure to the Report which was marked Exhibit B.

"2. The Special Grand Jury of January, 1969, did not in its 'presentment' request the publication threatened by the Court of the contents of the sealed attachments.

"3. Any publication of the enclosure, marked Exhibit B, would be violative of the provisions of Rule 6(e), Fed.R. Crim.P.

"4. There is no warrant or right under federal law for a public disclosure of a presentment or report.

"5. The use of a presentment is no longer countenanced under federal law and is not recognized by the Federal Rules of Criminal Procedure.

"6. A federal grand jury has no authority to issue a report, nor has a federal court authority to receive it.

"7. The publication of the enclosure, marked Exhibit B, to the Report of May 28, 1970, of the Special Grand Jury would deprive the petitioners of their rights under the Fifth and Sixth Amendments to the Constitution of the United States.

"8. The implicit threat by this Court of publication of the enclosure, marked Exhibit B, before the expiration of the term of the Special Grand Jury and before their discharge from service violates the separation of powers concept of the Constitution of the United States by unduly infringing upon the powers of the Executive, especially those reserved to that branch of government by Article II, Sections 1, 3 of the Constitution, while exceeding, at the same time, the powers of the federal judiciary as limited by Article III, Section 2 of the Constitution.

"To preserve the secrecy of their identity afforded the petitioners by Rule 6(e), Fed.R.Crim.P., and the secrecy of the Grand Jury proceedings, as required by that Rule, the petitioners further move the Court to conduct the hearing upon this petition, and other matters which may be related to this Court's announcement of May 28, 1970, concerning the Special Grand Jury Report, in camera, as if such a hearing were ancillary to the Grand Jury proceedings.

"In addition, the petitioners, directing the Court's attention to certain press reports of interviews with the Deputy Foreman of the Special Grand Jury, set forth in an appendix hereto, request the Court to enjoin each member of the January, 1969, Special Grand Jury from disclosing now or hereafter to any person directly or indirectly the contents or the substance of the contents of Exhibit B attached to the Grand Jury Report of May 28, 1970."

would be made public until such persons had an opportunity to seek a writ of prohibition from the United States Court of Appeals for the Fourth Circuit and agreed to discuss further with counsel whether particular sessions or parts thereof should be held in camera or in open court.

On June 12 the Court asked Melvin J. Sykes, a highly respected member of the Bar of this Court, to advise the Court on the legal questions which had been raised and which might be raised hereafter in this matter. In a formal order dated June 15, the Court stated: "Mr. Sykes is being asked to advise the Court what under the law the Court must do or must not do, and what under the law the Court has the discretion to do or not to do and the factors which may or should be considered in the exercise of such discretion".

On June 16 counsel for the Petitioners asked the Court if it would agree that everything said or done by the Grand Jury in Court on June 17, or anything related to this matter, should be in camera. Since the Court knew that the Grand Jury might present to the Court a document which might be ultimately held to be an indictment sufficient to start a prosecution,[5] the Court refused to agree that the entire proceedings on June 17 should be in camera, but that the Court would consider a request that parts of the proceeding be in camera and that the Court had instructed United States Attorney Beall to screen carefully any remarks to be made by the Grand Jury in open court, and that the Court would review such remarks before permitting them to be made publicly.

On the same day, June 16, John Doe, Richard Roe, and Peter Poe, through the same attorneys who had filed their Petition in this Court, filed a Petition for a Writ of Prohibition with Circuit Court Judge Bryan of the United States Court of Appeals for the Fourth Circuit, alleging explicitly that they "are adult citizens of the United States who are each mentioned prominently by his correct name in a certain paper delivered under seal to Chief Judge Roszel C. Thomsen, United States District Court for the District of Maryland, as an attachment to a report entitled 'Presentment' Submitted by the Special Grand Jury of the District of Maryland, impaneled in January 1969". The Petition continued: "The attachment is said to be a draft form of indictment which the Grand Jury would like to return against the petitioners, but were prevented from doing so because of the refusal of the United States Attorney for the District of Maryland to affix his signature thereto". A copy of the "Presentment", but not its attachments, was attached to the Petition filed with Judge Bryan.

They obtained from Judge Bryan an "Order to Show Cause", which read as follows:

"Upon the foregoing Petition for Writ of Prohibition it is this 16th day of June, 1970, by the United States Court of Appeals for the Fourth Circuit ORDERED:

"1. That unless an in camera hearing is conducted, the Honorable Roszel C. Thomsen, Chief Judge, United States District Court for the District of Maryland, show cause by an appropriate answer or other response on or before the 23rd day of June, 1970, why the relief requested should not be granted, and;

"2. That the Honorable Roszel C. Thomsen, Chief Judge, United States District Court for the District of Maryland, be and he is hereby directed

"(i) not to conduct any public court session during which any facet of the Grand Jury's deliberations or attitudes concerning the Attorney General's recommendations for prosecution of the petitioners will or can be discussed pending further order of this Court, but this order shall not be construed to preclude an in camera

---

5. See opinion of Judges Rives, Gewin and Bell in United States v. Cox, supra.

hearing upon the foregoing matters in the presence of the District Judge, the grand jury and the United States Attorney;

"(ii) to enter such orders or decrees as may be appropriate to maintain status quo with respect to this proceeding pending the hearing on the Show Cause Order issued by paragraph one of this Order."

On June 17 the Special Grand Jury met, and after their session came into open court. In response to the customary question by the Clerk, whether they had agreed upon any indictments, they replied in the affirmative, and delivered to the Court two envelopes. Thereupon, pursuant to Judge Bryan's order, the court room was cleared of all persons, except the Grand Jury, the attorneys for the Government, and the official court reporter, who was sworn to secrecy. One of the papers delivered to the Court was an "Indictment", identical to the draft form of indictment filed as part of the Presentment of May 28, but this time bearing the signature and title of the Deputy Foreman under the words, "A TRUE BILL". The paper was not signed by the United States Attorney or by any other attorney for the Government.[6]

Mr. Beall stated that he had been instructed by the Department of Justice not to sign the indictment voted by this Grand Jury.

Mr. Beall also presented to the Court: (1) a report to Will Wilson, Assistant Attorney General, Criminal Division, from Henry Peterson, Deputy Assistant Attorney General; the Chief and the Deputy Chief of the General Criminal Section, and two attorneys in the Criminal Division, dated June 12, and approved by Mr. Wilson, which will be discussed below, and (2) a legal memorandum "concerning public dis-

closure of Grand Jury action not constituting indictment", prepared by the Criminal Division, discussing the applicable law with respect to making public "Presentments" or reports of a Grand Jury. The memorandum concludes with the statement: "The Department of Justice takes no position as to the propriety of disclosing publicly the Grand Jury Presentment in this case. We will fully abide by the decision reached by this Court."

The Deputy Foreman also made a statement to the Court which the Court concludes cannot be made public because of the provisions of Rule 6(e), F.R.Crim. P.

Mr. Beall stated to the Court that an independent study of the Grand Jury's deliberations had persuaded him to favor its recommendations. However, the professional staff of the Criminal Division of the Department of Justice, after review of the facts and the law upon which the indictment is based, is of the contrary opinion for the reasons expressed in the report. "Put simply", said Mr. Beall, "there is a genuine difference of legal opinion between the Department and myself".

The Government took and still takes the position that the indictment found and returned by the Grand Jury on June 17 is not a true indictment, sufficient to start a prosecution, because it is not signed by an attorney for the Government.

After that in camera session, the Court made available to counsel for Petitioners copies of the papers which had been filed, except the statement of the number of jurors concurring in the finding of the indictment, and arranged for an in camera hearing on Friday, June 19, to consider the original Petition and a "Supplemental Petition to Suppress and Expunge" the additional documents

---

6. A line for such signature was typed at the end of the indictment, under which was typed "George Beall, United States Attorney", but Mr. Beall stated in substance that the paper had been prepared in the usual form at the request of the Grand Jury and that the typing of his name under the line where his signature would normally appear, was not intended to be the equivalent of his signature. Cf. Wiltsey v. United States, 222 F.2d 600 (4 Cir. 1955).

received by the Court on June 17, which Petitioners proposed to file and did file before the June 19 hearing.

Immediately before that hearing a Petition was filed herein by two citizens and taxpayers of the United States, Howard Waterhouse and Nancy Hall, praying that a "mandatory injunction be issued commanding John N. Mitchell, Attorney General of the United States of America, and George C. Beall, United States Attorney for the District of Maryland, to perform their duty and prosecute t.. se persons accused on or about the 28th day of May, 1970, by the Special Grand Jury of committing crimes within the District of Maryland".

The Presidents of the Maryland State Bar Association and of the Bar Association of Baltimore City have expressed to the Court their concern over the fact that the newspapers and other media have made it appear that the action of the Grand Jury has been thwarted, without any explanation from the Attorney General, and their appreciation of the "serious legal questions whether or not the Grand Jury may have initiated criminal proceedings by its action to date, so that the matter should be carried forward and prosecuted or, if not, whether or not its report should be made public by order of the District Court, acting within its discretion". A copy of this letter has been filed in this proceeding.

The hearing on June 19, held in camera, consumed an entire day, until 6:30 p. m. Mr. Sykes gave a comprehensive review of the law, presenting the authorities and arguments for all points of view, as requested by the Court. The Court was also aided by able briefs and arguments from counsel for Petitioners.

The United States Attorney reaffirmed that the position of the Department of Justice is that contained in the report of the Criminal Division and the memorandum of law filed with the Court in camera on June 17. In response to a direction from the Court, Mr. Beall got in touch with representatives of the Criminal Division by telephone. After a conference, they authorized him to say that if the Court held the so-called indictment delivered to the Court on June 17 to be sufficient to institute a prosecution, the Department would direct the United States Attorney that unless additional evidence were developed, the Department would stand on the position taken in the report of the Criminal Division previously filed, and any such proceeding would eventually be subect to dismissal for want of prosecution.[7]

On Saturday, June 20, after considering the authorities cited on the previous day, and considering the arguments made, the Court reached two conclusions: (1) that the so-called indictment found by the Grand Jury and attested "a true bill" by the signature of the Deputy Foreman but not signed by an attorney of the United States, was not sufficient to institute a prosecution, and (2) that considering the rights of all persons involved, and the public's right to know, the interests of justice required some measure of disclosure by the Court.

In the middle of the afternoon of the same day, the Court received a telephone call from Paul R. Connolly, one of the attorneys for Petitioners, who stated that "the Washington Bureau of the New York Times and certain of its employees appear to be in possession of a document or documents of the Special Grand Jury

---

7. At the conclusion of the hearing counsel for petitioners agreed that this Court had fully complied with Judge Bryan's order, and that this Court's opinion and decision should be made public. The Court reiterated its previous statement that if it concluded that the name of any of the real petitioners should be made public, the Court would give that petitioner an oppor-

tunity to seek a writ of prohibition from the Fourth Circuit before this Court made his name public. No petitioner whose name is made public in this opinion or in Exhibits A and B attached hereto, objected to the reading of this opinion in open court this afternoon, after it had been read in chambers to counsel.

of this District, and that the New York Times intends to publish such document(s), or all or part of their contents in its editions of Sunday, June 21, 1970." He requested that the Court issue an order "that unless the New York Times show cause before the Court by June 25, 1970, at 10 a. m., why they should be in lawful possession of the Special Grand Jury document(s), the New York Times Company and all of its agents and employees are enjoined and restrained from publishing or disseminating such document(s) or their contents in any manner either directly or indirectly.

Mr. Connolly stated that he did not know from whom the paper had obtained the document or documents, but made oath to the Court over the telephone that the facts quoted above were true. He stated that George Nilson, an associate of Piper & Marbury, would bring such proposed order to the Court's home as promptly as possible, because he was advised that the newspaper deadline was 4:30 or 5:00 o'clock that afternoon. John Martin Jones, Jr., the active Baltimore attorney for Petitioners, was unavailable, but the Court was able to reach William L. Marbury, one of the attorneys for Petitioners, who came promptly to the conference. After several telephone conversations, including a three-cornered telephone conversation between Mr. Marbury, Mr. Sykes and the Court, the Court agreed to and did issue a Show Cause Order, based upon (1) Mr. Connolly's oral affidavit, (2) a statement that it appeared to the Court that such publication may impair the jurisdiction of the Court to grant effective relief to Petitioners upon their petition to suppress and expunge, should it determine that such relief is appropriate and (3) the authority vested in the Court by 28 U.S.Code, sec. 1651 (the all-writs statute). That order directed that "the New York Times Company show

cause before the Court on or before June 25, 1970, at 10 a. m., why they should not be restrained from disclosing or publishing the contents of the documents delivered to the Court by the Special Grand Jury on May 28, 1970, or June 17, 1970, which were ordered sealed by the Court."

The Court authorized Mr. Connolly and his associates to bring this order to the attention of the officers, agents and employees of the New York Times Company at once. In his last telephone conversation, Mr. Connolly said that he had just been told that a representative of that paper had said that a reporter of the Times had obtained a copy of the so-called indictment from a Baltimore juror. Mr. Marbury offered to confirm that information from James Reston, Vice President of the Times, with whom Mr. Marbury is acquainted, and the Court authorized Mr. Marbury to tell Mr. Reston that if in fact the paper had obtained the document from a Grand Juror, the Court concurred in Mr. Marbury's position that it should not be published. During the evening the Court was able to reach Mr. Beall, Mr. Sachs and Alan I. Baron, the former Assistant United States Attorney who handled the matter with Mr. Sachs, and all of them told the Court that so far as each of them knew, no copy of the draft of the indictment attached to the Presentment or of the "indictment" signed by the Deputy Foreman had been given to any of the Grand Jury except one copy of each given to the Deputy Foreman, which, after the Jury had voted in secret, was placed in an envelope and presented to the Court.[7a]

Accordingly, and because of (1) the serious First Amendment problems involved, (2) the fact that no injunction had been issued against the Times, and (3) the fact that the Court was advised that some of the papers were already on

---

7a. After this opinion was delivered orally in open court but before it was typed and filed, Mr. Marbury informed me that Mr. James Reston states that he does not know the source of the information which was printed in the New York Times, but has been informed by the reporter who wrote the story that it was not obtained from any member of the Grand Jury.

the street or being delivered to vendors or distributors, the Court refused to issue at that time a further order threatening the Times with the charge of contempt, but agreed to hear an application for such an order on Monday morning, June 22, based upon a proper showing, and agreed to take appropriate action to determine whether any Grand Juror had violated his oath of secrecy, or anyone else had violated any duty imposed on him.

A long article in the New York Times on Sunday, June 21, contained a detailed account, said to have been "pieced together from reliable sources", of the results of an investigation by Mr. Sachs, Mr. Baron and Mr. Abbell, "for the Grand Jury". The article also included what purported to be a brief summary of the Presentment delivered to the Court by the Grand Jury. A copy of the article has been filed by the Court in this proceeding.

A briefer article appeared in the Washington Post on the same day. A copy of that article has been filed in this proceeding.

On Monday, June 22, this morning, the Baltimore Sun published a long article about the investigation and the court proceedings. The article contained one or more statements which, if actually made to a reporter by a Grand Juror, possibly violated the Grand Juror's oath of secrecy. The Court has ordered that a copy of the Sun article be filed in this proceeding.

Whether or not anyone was at fault in connection with the recent publicity, the fact that it has occurred must be taken into account by the Court, along with all the other circumstances, in determining the extent to which court-authorized disclosure of the contents of the indictment and the evaluation of the proposed

prosecution by the Department of Justice should be made.

A consideration of the respective rolls of the Grand Jury and the Executive Branch in the criminal process is essential to the determination of the principal issues now before the Court; i. e. (1) the legal effect of the "Presentment" and the "Indictment", and (2) the extent of the public disclosure, if any, of their contents which should be made under all the circumstances of this case.

The Grand Jury is both a sword and a shield.[8] "The Grand Jury serves two great functions. One is to bring to trial persons accused of crime upon just grounds. The other is to protect persons against unfounded or malicious prosecutions by insuring that no criminal proceeding will be undertaken without a disinterested determination of probable guilt." Orfield, The Federal Grand Jury, 22 F.R.D. 343, 394. Judges, lawyers and commentators have differed as to which is the more important and valuable function.[9]

"The grand jury possesses plenary and independent inquisitorial powers. The Supreme Court has held that an Executive Order and a Circular Letter of the Department of Justice requiring approval of the Attorney General before any evidence could be presented in certain cases 'was not intended to curtail or limit the well-recognized power of the grand jury to consider and investigate any alleged crime within its jurisdiction. See United States v. Thompson, 251 U.S. 407, 413–415, 40 S.Ct. 289, 291–292, 64 L.Ed. 333; Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 779; Hale v. Henkel, 201 U.S. 43, 61–66, 26 S.Ct. 370, 373–376, 50 L.Ed. 652; Frisbie v. United States, 157 U.S. 160, 163, 15 S.Ct. 586, 587, 39 L.Ed. 657.' Sullivan v. United States, 1954, 348

---

8. See Judge Irving R. Kaufman "The Grand Jury—Sword and Shield" in The Atlantic, April 1962, p. 54 et seq.

9. See, e. g., Application of United Electrical etc. Workers, 111 F.Supp. 858 (S.D.

N.Y.1953); In re Grand Jury Proceedings, 4 F.Supp. 283, 284 (E.D.Pa.1933); United States v. Smyth, 104 F.Supp. 279, 283 (N.D.Cal.1952).

U.S. 170, 173, 75 S.Ct. 182, 184, 99 L. Ed. 210." Opinion of Judges Rives, Gewin and Bell in United States v. Cox, 342 F.2d 167, at 175 (5 Cir. 1965).

Rule 6(e), F.R.Crim.P., requires that the Grand Jury operate, with limited exceptions, under the strictest secrecy. The need for that secrecy was well stated by Judge Irving R. Kaufman, of the Second Circuit, in an article in the Atlantic Monthly, published in April 1962:

"The secrecy surrounding the grand jury proceeding is admittedly designed to aid the jury in carrying out its law-enforcement duties. Witnesses at grand jury hearings are more likely to talk freely if they are assured that their testimony will not be made public. Moreover, it is a practical necessity that the subject of a grand jury investigation remain secret. If a suspect has advance notice that he is under investigation, not only can he seek to put pressure on the grand jury directly or to intimidate witnesses, but he can destroy documentary evidence, and, if palpably guilty, flee. The secrecy of its proceedings also protects the grand jury from public hysteria, either for or against indictment. * * [T]he total secrecy of the grand jury room is also a valid protection to the accused. * * * [T]he grand jury hears only evidence against the suspected. Some of this evidence is hearsay; all of it is usually damaging; and the accused is not represented by counsel. If an indictment is returned, it is undesirable that this testimony, some of it inadmissible at trial, yet carrying the prestige of the grand jury, be made known to prospective jurors or to the public. * * *

"More important, however, is the position of a person investigated but not indicted. He will never have the opportunity to rebut the charges made against him, if the secrecy has been lifted, in any forum comparable to a courtroom. The witness before the grand jury may have been mistaken or untruthful. This is all the more likely since the grand jury had refused to indict. But revelation of these charges would nevertheless deal a blow to an innocent reputation. Yet the knowledge that a grand jury was investigating may seriously harm the individual's good name. * * * Op. cit. p. 60.

Whether the investigation is long or short, broad or narrow, when all the evidence has been presented, the grand jurors dismiss everyone from the grand jury room and commence their deliberation in secret. Their job is to decide not the guilt or innocence of the suspect but only whether the prosecutor has presented sufficient evidence to permit the case to go on to the next stage, which is the trial.

"Sixteen of the grand jurors constitute a quorum. Unless twelve of them believe that the prosecutor has made out a case, a 'no true bill' is voted. If twelve believe an indictment is proper, the grand jury votes a 'true bill' and subsequently hands the written charge (indictment) to the judge.

"At that moment, the secretly suspected becomes the publicly accused * * *. From this moment, too, the defendant is surrounded by the myriad safeguards subsumed under the phrase 'due process'. He need not speak a word in his defense, for the prosecutor carries the burden of proving guilt beyond a reasonable doubt. At trial, rules of evidence will be vigorously applied to exclude hearsay and prejudicial material, and the defendant has a constitutional right to counsel and to present his case. * * *" Op. cit. p. 56.

The Executive Branch also has a major role in the bringing, as well as in the conduct and control, of criminal proceedings in a Federal Court. In a recent case, Smith v. United States, 375 F.2d 243, at 246–247 (5 Cir. 1967), the Court said:

"The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to 'take

care that the laws be faithfully executed * * * '. The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. 5 U.S.C.A. § 291 et seq., 28 U.S.C.A. § 507. The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute. Confiscation Cases, 1869, 74 U.S. (7 Wall.) 454, 19 L.Ed. 196; Powell v. Katzenbach, 1965, 123 U.S.App.D.C. 250, 359 F.2d 234, cert. den. 1966, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359, reh. den. 384 U.S. 967, 86 S.Ct. 1584, 16 L.Ed.2d 679. We held in United States v. Cox, 5 Cir. 1965, 342 F.2d 167, 171:

" 'The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.' "

Some of the reasons for this discretion were stated by Judge Wisdom in his opinion in the *Cox* case, at p. 193, quoted below. See also Pugach v. Klein, 193 F. Supp. 630, 634–635 (S.D.N.Y.1961).

The Fifth Amendment to the Constitution of the United States provides: "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a Grand Jury", except in certain cases not applicable here.

Federal statutes are silent on the relationship which is to exist between a Federal Grand Jury, the District Court which summons it, and the United States Attorney's office in the District. From 1789 to the present, Congress has made no definitive statement concerning Grand Jury powers.[10]

Rule 6, F.R.Crim.P., is captioned "The Grand Jury". Paragraph (f) of that Rule deals with the finding and return of indictments and says nothing about the role of the attorney for the Government in the bringing of a valid indictment. Rule 7, captioned "The Indictment and Information" provides in pertinent part that "the indictment shall be signed by the attorney for the government".

The Advisory Committee note does not indicate that the quoted provision was intended to change existing practice, although of course the Rule has the effect of law.

No decided case except United States v. Cox has been cited or found in which a Court had before it or was directly considering the effect of the failure or refusal of the attorney for the Government to concur with the Grand Jury in instituting a prosecution by way of indictment. A majority of the judges in the *Cox* case [11] were of the opinion that there could be no valid prosecution in that situation. This conclusion was cited with approval in United States v. Wright, 365 F.2d 135 (7 Cir. 1966), and in Gaither v. United States, 134 U.S.App. D.C. 154, 413 F.2d 1061 (1969), as well as in the later Fifth Circuit case of Smith v. United States, supra. The conclusion of the majority in *Cox* is supported by the doctrine of the separation of powers, as well as by the provisions of Rule 7(c) cited above.

There are statements in some decisions which at first blush appear to throw

10. United States v. Cox, 342 F.2d 167, at 186.

11. Judges Jones, Tuttle, Brown and Wisdom.

doubt on that conclusion.[12] All of those statements, however, were dicta, because in none of those cases had the attorney for the Government refused to sign the indictment. Apparently, there is no reported case in which a court has held that a Federal Grand Jury has the power to institute a prosecution by an indictment without the concurrence of the attorney for the Government. The absence of any case so holding and the sparseness of authority on the subject indicate that Federal Grand Juries have seldom or never attempted to do so.

Judge Wisdom's opinion in *Cox* traces the history of the Grand Jury, 342 F.2d pp. 186 et seq., and the functions of the Attorney General and the Department of Justice in instituting and conducting prosecutions, pp. 190 et seq. He concludes that the Grand Jury never had a plenary power to indict, p. 189, and states, p. 193:

"The reason for vesting discretion to prosecute in the Executive, acting through the Attorney General is twofold. First, in the interests of justice and the orderly, efficient administration of the law, some person or agency should be able to prevent an unjust prosecution. The freedom of the petit jury to bring in a verdict of not guilty and the progressive development of the law in the direction of making more meaningful the guarantees of an accused person's constitutional rights give considerable protection to the individual before and after trial. They do not protect against a baseless prosecution. This is a harassment to the accused and an expensive strain on the machinery of justice. The appropriate repository for authority to prevent a baseless prosecution is the chief law-enforcement officer whose duty, *unlike the grand jury's duty, is to collect evidence on both sides of a case.*

"Second, when, within the context of law-enforcement, national policy is involved, because of national security, conduct of foreign policy, or a conflict between two branches of government, the appropriate branch to decide the matter is the executive branch. The executive is charged with carrying out national policy on law-enforcement and, generally speaking, is informed on more levels than the more specialized judicial and legislative branches. In such a situation, a decision not to prosecute is analogous to the exercise of executive privilege. The executive's absolute and exclusive discretion to prosecute may be rationalized as an illustration of the doctrine of separation of powers, but it would have evolved without the doctrine and exists in countries that do not purport to accept this doctrine." 342 F.2d at 193.

■ The policy reasons stated by Judge Wisdom and embodied in the decision of the majority in *Cox* persuade this Court that the document signed by the Deputy Foreman and delivered to the Court on June 17 cannot properly be considered (1) an indictment or (2) to institute a criminal prosecution.

■ Those reasons and the decision of the majority in *Cox*, as well as the Court's study of other cases, make it clear that the Court has no jurisdiction to order the Attorney General of the United States or the United States Attorney to sign the "indictment" or to prosecute the persons named therein. The intervening Petition of Howard Waterhouse et al., must therefore be dismissed.[13]

---

12. In re Lane, 135 U.S. 443, 449, 10 S.Ct. 760, 34 L.Ed. 219 (1890); Crowley v. United States, 194 U.S. 461, 475, 24 S.Ct. 731, 48 L.Ed. 1075 (1904); Renigar v. United States, 172 F. 646 (4 Cir. 1909); Wheatley v. United States, 159 F.2d 599 (4 Cir. 1946); Wiltsey v. United States, 222 F.2d 600 (4 Cir. 1955).

13. Powell v. Katzenbach, 123 U.S.App. D.C. 250, 359 F.2d 234 (1965), cert. den. 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359, reh. den. 384 U.S. 967, 86 S.Ct. 1584, 16 L.Ed.2d 679.

■ Even though the document delivered to the Court by the Grand Jury on June 17 is not a valid indictment, and is not sufficient to begin a criminal prosecution, it does not follow that the Grand Jury did not have the power to deliver that document to the Court, or to deliver the Presentment of May 28 to the Court. As Judge Wisdom noted: "There is, however, 'every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor'." 342 F.2d at 186. Judge Wisdom cited for this proposition Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956), and Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

■ The common law powers of a grand jury clearly include the power to make presentments, sometimes called reports, calling attention to certain actions of public officials, whether or not they amounted to a crime. The reasons for allowing such presentments or reports were eloquently stated by Chief Justice Vanderbilt, "In re Presentment by Camden Grand Jury", 10 N.J. 23, 89 A.2d 416, 443–444 (1952), as follows:

"We are not unaware of a respectable body of authority in other jurisdictions that frowns on the exercise by the grand jury of its common-law right to make presentments of matters of public concern unaccompanied by indictments. In some of these jurisdictions the powers of the grand jury are governed by statute and the problem there is solely one of statutory construction, but such is not the case here. A practice imported here from England three centuries ago as part of the common law and steadily exercised ever since under three successive State Constitutions is too firmly entrenched in our jurisprudence to yield to fancied evils. If presentments of matters of public concern were found necessary in the public interest in the relatively simple conditions of English and colonial life three centuries ago, how much more es-

sential are they in these days when government at all levels has taken on a complexity of organization and of operation that defies the best intentions of the citizen to know and understand it. What is not known and understood is likely to be distrusted. What cannot be investigated in a republic is likely to be feared. The maintenance of popular confidence in government requires that there be some body of laymen which may investigate any instances of public wrongdoing. * * *

"Thus grand jury presentments of public affairs serve a need that is not met by any other procedure. The grand jury provides a readily available group of representative citizens of the county empowered, as occasion may demand, to voice the conscience of the community. There are many official acts and omissions that fall short of criminal misconduct and yet are not in the public interest. It is very much to the public advantage that such conduct be revealed in an effective, official way. No community desires to live a hairbreadth above the criminal level, which might well be the case if there were no official organ of public protest. Such presentments are a great deterrent to official wrongdoing. By exposing wrongdoing, moreover, such presentments inspire public confidence in the capacity of the body politic to purge itself of untoward conditions.

"The chief objection to grand jury presentments of public affairs urged on us is that a public official or even a private citizen who is in some way associated with public affairs may have charges preferred against him which he may not be afforded an opportunity to answer. There is this possibility, but the danger is not confined to presentments. It is not infrequent for persons to be named in indictments without their being indicted, although they do not often complain that they are not indicted with those who are. Many indict-

ments, moreover, are never brought to trial. The dangers to a public official or a private citizen from unfounded presentments are far less than those attending the other forms of public investigations we have mentioned, by reason of the care with which grand juries are selected, the secrecy with which they deliberate and the judicial control of such presentments when they are handed to the court. Of course, if grand juries are selected on a partisan basis, partisan presentments might result. The remedy therefor is not to abolish presentments but to abolish partisan grand juries."

For a different point of view, see In re Report of Grand Jury of Baltimore City, 152 Md. 616, 631–632, 137 A. 370 (1927).

The whole question is elaborately discussed by Kuh in an article entitled The Grand Jury "Presentment": Foul Blow or Fair Play?, 55 Columbia L.Rev. 1103. See also 74 Harvard L.Rev. 590. The Court has considered the opinion of Judge Bryan in Petition for Disclosure of Evidence, 184 F.Supp. 38 (E.D.Va. 1960), and the opinion of Judge Weinfeld in Application of United Electrical etc. Workers, 111 F.Supp. 858 (S.D.N.Y. 1953). The Court has also noted the recent action of Judge Robson of the Northern District of Illinois in accepting and releasing a grand jury report dealing with a police raid on the Chicago Black Panther party headquarters.

All of those opinions dealt with situations unlike the one presented by this case. Here the situation is more like, though not identical with, that considered by Judge Wisdom in *Cox* when he said:

"Criminal presentment based on the grand jury's own knowledge or on knowledge furnished by others may be in disuse in federal courts, but it has not been read out of the Constitution. Hale v. Henkel, 1906, 201 U.S. 43, 62, 26 S.Ct. 370, 50 L.Ed. 652. See also Blair v. United States, 1919, 250 U.S. 273, 280, 39 S.Ct. 468, 63 L.Ed. 979

and Sullivan v. United States, 1954, 348 U.S. 170, 173, 75 S.Ct. 182, 99 L. Ed. 210; Kuh, The Grand Jury 'Presentment'; Foul Blow or Fair Play, 55 Col.L.Rev. 1103 (1955).

"Presentment is a natural corollary to the grand jury's inquisitorial power, either for an inquisition of office or for a prosecutory purpose. Its use here would not accomplish its prosecutory purpose, because the Attorney General still could decline to submit a bill of indictment to the grand jury. On the other hand, in this case a presentment in open court with an appropriate minute entry would meet many of the objections to the government's position raised in the dissenting opinion and Judge Brown's *opinion.* * * * Aborting of the criminal presentment would, in effect, convert it into the familiar inquisition of office 'employed for centuries to designate the findings of a grand jury with respect to derelictions in matters of public concern, particularly of officials, *which may fall short of being* criminal offenses'. This use of presentment would be in accord with the established procedure in the common law and with the original understanding of the framers. I consider it preferable to the placebo the Government suggests: an indictment (which is not an indictment) to lie fallow until some day another Attorney General might or might not come along to vitalize it." 342 F.2d at 188–189.

This brings us to the question: what should be disclosed under the circumstances of this case?

The opinions in *Cox* furnish a guide. Five of the seven Judges thought there should be a disclosure. Judges Rives, Gewin and Bell said:

"The grand jury may be permitted *to function in its traditional sphere,* while at the same time enforcing the separation of powers doctrine as between the executive and judicial branches of the government. This can best be done, indeed, it is mandatory, by requiring the United States Attor-

ney to assist the grand jury in preparing indictments which they wish to consider or return, and by requiring the United States Attorney to sign any indictment that is to be returned. Then, once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward. That refusal will, of course, be in open court and not in the secret confines of the grand jury room. To permit the district court to compel the United States Attorney to proceed beyond this point would invest prosecutorial power in the judiciary, power which under the Constitution is reserved to the executive branch of the government. It may be that the court, in the interest of justice may require a showing of good faith, and a statement of some rational basis for dismissal. In the unlikely event of bad faith or irrational action, not here present, it may be that the court could appoint counsel to prosecute the case. In brief, the court may have the same inherent power to administer justice to the government as it does to the defendant. That question is not now before us and may never arise. Except for a very limited discretion, however, the court's power to withhold leave to dismiss an indictment is solely for the protection of the defendant. * * * 342 F.2d at 179.

" * * * How much better is the constitutional system by which the grand jury can find and return an effective indictment upon which a prosecution for crime is instituted. At that point the power of the grand jury ceases. It is effectively checked and overbalanced by the power of the Attorney General, recognized in Rule 48(a), to move for a dismissal of the indictment. The court may then require such a motion to be heard in open court. Instead of a prevention in the shadows of secrecy, there would be a dismissal in a formal, public judicial proceeding. * * * 342 F.2d at 180.

" * * * It is true that an indictment may properly be described as a type of pleading in a criminal case, but it constitutes the action of the grand jury and not the Attorney General. No one could logically contend that the Attorney General or the District Attorney was preferring the charges, because neither of them is permitted to remain in the grand jury room during deliberations or when the grand jurors vote a true bill or refuse to indict. It is well for the Attorney General to investigate, but conclusions reached by him as to facts are not binding on the grand jury. Grand jurors are unlimited in their inquisitorial powers. Their source of information is not limited to facts disclosed by investigative agencies or to information furnished by the Attorney General or the District Attorney. It is often true that lawyers and judges alike disagree with the actions of petit juries and grand juries. Corrective legal action may be taken, but neither the grand jury nor the petit jury can be compelled to follow the course of action desired by either the court or the Justice Department. * * * " 342 F.2d at 181.

Judge Brown took the position that:

" * * * The powers of the Executive are so awesome in determining those whom it will not prosecute, that where there is a difference between the Grand Jury and the Executive, this determination and the resulting conflict of views should be revealed in open court. With great power comes great responsibility. Disclosure of this difference of view and the resulting impasse would subject this decision of the Executive to the scrutiny of an informed electorate. The issue would be clearly drawn and the responsibility, both legally and in the public mind, plainly fixed. There would not be the sort of thing reflected in this record in which only in the loosest way could the public see what it was the Grand Jury pur-

posed to do and what the Executive declined to help it to do. * * * " 342 F.2d at 185.

Judge Wisdom, the fifth of the seven Judges, agreed, as we have seen, that the matter should be made public.

■ The arguments in the present case are stronger for a measure of disclosure than they were in *Cox*. Here, the Special Grand Jury, after months of hearings, has voted that a prosecution should be begun. Two United States Attorneys have agreed with this conclusion. The higher officials of the Department of Justice have decided, as is their right and their responsibility under the authorities, that the proposed indictment should not be signed by any attorney for the government, for the reasons stated in their report.[14]

Despite intimations to the contrary in the press, the public should know that no persons holding or who have held any federal office were charged by the Grand Jury with any offense; but the matters dealt with in the indictment do concern the public business.

■ The Court is the agency which must weigh in each case the various interests involved, including the right of the public to know and the rights of the persons mentioned in the presentment, whether they are charged or not. The Court should regulate the amount of disclosure, to be sure that it is no greater than is required by the public "interest in knowing" when weighed against the rights of the persons mentioned in the presentment.

■ It is not necessary in this case to attempt to lay down a rule which should apply in all situations. Each case should be decided on its own facts and circumstances. Here, there has been much discussion and disclosure in the communications media, some true, and some not true, particularly during the last few days. The people who have been investigated have been disclosed, and there have been rumors in the press naming persons who it does not appear have even been investigated. Under these circumstances, the Court concludes that the substance of the charges in the indictment should be disclosed, omitting

14. In Sullivan v. United States, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954), the defendant moved to dismiss an indictment for violation of income tax laws because, without sanction by the Attorney General's office, the District Attorney offered evidence to the grand jury upon which the indictment was returned. One of the points raised was that Circular Letter No. 2431 of the Department of Justice required approval from the Attorney General's office before any evidence could be presented to the grand jury and that such direction was not given. Referring to that Circular Letter, the Supreme Court said:

"* * * It was simply a housekeeping provision of the Department and was not intended to curtail or limit the well-recognized power of the grand jury to consider and investigate any alleged crime within its jurisdiction. See United States v. Thompson, 251 U.S. 407, 413–415, [40 S.Ct. 289, 64 L.Ed. 333]; Blair v. United States, 250 U.S. 273, 282, [39 S.Ct. 468, 63 L.Ed. 979]; Hale v. Henkel, 201 U.S. 43, 61–66, [26 S.Ct. 370, 50 L.Ed. 652]; Frisbie v. United States, 157 U.S. 160, 163, [15 S.Ct. 586, 39 L.Ed. 657].

"Therefore, it is not contended that, aside from the Executive Order and the departmental letter, a grand jury may not consider evidence of crime known to the grand jurors or revealed by their investigation. It is only urged that the Executive Order and the departmental letter limited the action of the grand jury in respect to cases concerning violations of internal revenue laws. We hold that the Order and the letter had no such restrictive effect, and that the grand jury in this case was free to consider the evidence put before it by Government counsel without authorization from the Attorney General's office in Washington. The evidence was presented by the District Attorney, who was a representative of the Department of Justice, notwithstanding that he failed to comply with the departmental directive. For this he is answerable to the Department, but his action before the grand jury was not subject to attack by one indicted by the grand jury on such evidence. The motions to dismiss were properly overruled." 348 U.S. at 173–174, 75 S.Ct. at 184–185.

certain portions as to which the Court, in the exercise of its discretion, concludes that the public interest in disclosure is outweighed by the private prejudice to the persons involved, none of whom are charged with any crime in the proposed indictment.

The Court is further of the opinion that the reasons of the Criminal Division of the Department of Justice, upon which the Attorney General's instructions to the United States Attorney were based, should also be made public, with the exception of the very brief summary of the proposed indictment contained therein.

This simultaneous disclosure provides a measure of protection of the interest of the persons named in the indictment, who have no opportunity to make their defense in court.

The Court is filing with this opinion, as Exhibit A, a summary of the presentment and, as Exhibit B, the report of the Criminal Division of the Department of Justice referred to above in the opinion. Except to the extent that anything is disclosed in this opinion or those two exhibits, the Court will enter an order expunging from the records of this Court and order sealed all other matters contained in the presentment, the proposed indictment and the statements made by the Deputy Foreman of the Grand Jury and the United States Attorney at the time the proposed indictment was filed.

The Court expresses to Mr. Sykes great appreciation for the quantity as well as the high quality of his work as amicus curiae.

## EXHIBIT A

The proposed indictment charges Victor Frenkil and Baltimore Contractors, Inc., the only defendants named therein, with conspiring with Bernard Shepard, a vice-president of Baltimore Contractors, Inc., and "other persons to the Grand Jury known and unknown", to defraud the United States of its right to have the disinterested services of its officials and employees unimpaired by the exertion of improper pressure and influence.

It is charged that the conspiracy included:

seeking to convince the Architect of the Capitol and his officials and employees that, by virtue of Victor Frenkil's allegedly close relationship, association and friendship with high government officials, including Members of both Houses of Congress, he had the ability to affect, either adversely or favorably, the employment of officials and employees of the Architect of the Capitol;

seeking to obtain the assistance of Members of both Houses of Congress, concerning matters of Baltimore Contractors, Inc., pending before and to be submitted to the Architect of the Capitol in connection with the Underground Garage Construction Project, and causing them to intercede with the Architect of the Capitol at various times on behalf of defendants with respect to the aforesaid matters;

promising employment benefits and advances to various officials in the office of the Architect of the Capitol in return for action favorable to defendants on matters then pending before and to be submitted to the Architect of the Capitol in connection with the Underground Garage Construction Project; and

threatening, directly and indirectly, various officials and employees of the Architect of the Capitol with the loss of their jobs for failing or refusing to act in favor of Baltimore Contractors, Inc., on matters then pending before and to be submitted to the Architect of the Capitol in connection with the Underground Garage Construction Project.

It is alleged that it was a further part of said conspiracy that the defendants would offer money to Senator Russell B. Long of Louisiana and another as an inducement for them to bring the prestige, weight and influence of their respective offices to bear upon officials and em-

ployees of the Architect of the Capitol so as to further and promote the interests of the defendants in their dealings with the Architect of the Capitol.

It is alleged that it was a further part of said conspiracy that the defendants in an effort to gain the goodwill of Congressman Hale Boggs of Louisiana, and in the hope and expectation that Congressman Boggs would bring the prestige, weight and influence of his office to bear upon the Architect of the Capitol and employees of the Architect of the Capitol, with respect to the matters of Baltimore Contractors, Inc., then pending before and to be submitted to the Architect of the Capitol in connection with the Underground Garage Construction Project, would and did cause the Maryland residence of Congressman Boggs, at 5315 Bradley Boulevard, Bethesda, Maryland, to be remodeled at a price to Congressman Boggs substantially below its cost.

The indictment lists numerous acts, not in themselves criminal, alleged to have been done in furtherance of the conspiracy. The Grand Jury does not charge that any improper payment was made to any public official.

## EXHIBIT B

UNITED STATES GOVERNMENT        DEPARTMENT OF JUSTICE
Memorandum

TO        : Mr. Will Wilson        DATE: June 12, 1970
              Assistant Attorney General
              Criminal Division

FROM      : Henry Petersen, Deputy Assistant Attorney General;
              Carl W. Belcher, Chief, General Crimes Section;
              Alfred L. Hantman, Deputy Chief, General Crimes Section;
              Richard Boylan and Stephen M. Weglian, Attorneys

SUBJECT: *House Office Building Underground Garage Project*

———◆———

After careful review of the evidence and the law upon which the proposed indictment is founded, the above named staff of the Criminal Division believes there is insufficient legal basis and supporting evidence to prove the charges made by the Grand Jury in this matter. The second paragraph, which briefly summarizes the proposed indictment, is not reproduced in view of the Court's summary, filed herewith.

To fall within the statute, the conspiracy must be directed at unlawful ends and/or utilize unlawful means. The evidence elicited by the investigation of this matter does not indicate that there was any conspiracy undertaken for unlawful purposes. While the representatives of the Architect of the Capitol's office disagree with Frenkil and Baltimore Contractors as to the merits of the claims in controversy, they do not doubt that he honestly believed that his claims were meritorious and that the claims may in fact have some merit.

Therefore, if there were any conspiracy in violation of the conspiracy to defraud statute, the Government would have to prove beyond a reasonable doubt that the alleged conspirators adopted unlawful means to accomplish the ends which were in themselves lawful. However, no conviction under the conspiracy to defraud statute has ever been sustained where the charges of improper and undue influence rested on evidence of "overreaching" alone. See, Goldstein, Conspiracy to Defraud the United States, 68 Yale L.J. 405 (1959). In every such reported case, the Government has also

been able to prove fraudulent or otherwise corrupt conduct on the part of the conspirators.

For the reasons set forth below, we have determined that there is insufficient evidence of the employment of such means in this instance to prove that the alleged conspirators violated the statute.

(1) While the conduct of Frenkil and his associates may be considered by some to have been heavy handed, taken as a whole and viewed in the context of the substantive controversy between Architect of the Capitol and Baltimore Contractors, Inc. neither Frenkil's conduct nor that of his other associates can be proven to be a violation of any criminal statute. Moreover, the evidence developed by the Grand Jury is insufficient to show any instance of corruption on the part of any Federal officers or employees of any branch of the Government.

(2) The Grand Jury investigation has failed to show that Frenkil's claims for additional compensation for the work by his company were fraudulent.

(3) The evidence of alleged threats made by Frenkil or his associates to terminate the employment of certain Architect of the Capitol personnel is insufficient to prove a violation of Federal statutes.

(4) The various threats or promises made by those acting in behalf of Frenkil or his firm, can not be proven to have been directed by Frenkil.

(5) The actions by Hunter in regard to Frenkil's claim as authorized by Senator Long were not illegal within the meaning of Title 18 U.S.C. 205(1).

(6) It was not until more than two years after the completion of the remodeling work that Frenkil asked Congressman Boggs to contact the Architect of the Capitol's office on behalf of Baltimore Contractors. Thus, there is substantial doubt that the remodeling of Congressman Boggs' home is related closely enough to Frenkil's requests for him to contact the Architect of the Capitol's office to be legally relevant and admissible in evidence. Additionally, Congressman Boggs' few contacts with the Architect of the Capitol's office cannot be shown to have been undertaken for any improper motives.

We are of the opinion that the Grand Jury, former United States Attorney Stephen H. Sachs, and his associates with the full knowledge, support and participation of the Criminal Division, thoroughly investigated the allegations presented to them, and that all reasonable leads have been exhausted. However, for the reasons heretofore stated, the above named professional staff of the Criminal Division are of the view that the evidence elicited by the Grand Jury investigation in this matter when viewed in a manner most favorable to the Government would not establish beyond a reasonable doubt the charges that the alleged conspirators used unlawful means to obtain settlement of Baltimore Contractor's claims on the House Underground Garage Project. Therefore, we recommend that the United States Attorney for the District of Maryland be instructed not to sign the indictment voted by the Grand Jury.

APPROVED:

s/ ———————————
WILL WILSON